STATE of Missouri, Respondent,

v.

Alis B. JOHNS, Appellant.

No. SC 81479.

Supreme Court of Missouri,
En Banc.

Dec. 5, 2000.

Rehearing Denied Jan. 9, 2001.

Melinda K. Pendergraph, Christopher A. Slusher, Nancy McKerrow, Asst. Public Defender's, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Attys. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for Respondent.

PRICE, Chief Justice.

A jury convicted Alis Ben Johns (a.k.a. Joe Johns) of first degree murder for the killing of Thomas Stewart on October 1, 1996. Because the trial court sentenced Johns to death, we have exclusive jurisdiction over the appeal. *Mo. Const. art. V, section 3.* We affirm the judgment.

## I. *Facts*

Alis Johns began spending time with Thomas Stewart in the spring of 1996. Both men traveled in the same circles and spent considerable time drinking alcohol together. On the night of October 1, 1996, Johns accepted a ride from Stewart's girlfriend, Deborah Tedder. Stewart, who had been fighting with Tedder earlier in the day, followed in his truck and eventually confronted Johns and Tedder on rural Highway KK in Pulaski County. All three individuals were intoxicated. The confrontation became violent, and two of Tedder's car windows were shattered. At some point, Johns exited the automobile with a .22 caliber pistol. Johns shot Stewart seven times, killing him.

At 10:00 p.m., Robert and Christina Deardeuff passed by the scene while returning home from a family gathering. They saw Stewart's gray Chevrolet truck stopped in the northbound lane with a small white car in close proximity. Robert also noticed a man lying face down between the automobile and the truck. As they approached the second vehicle, Robert slowed down to offer his assistance. But Johns admonished them several times, "Everything's all right—just go on." After the Deardeuffs left the scene, Johns and Tedder fled in Tedder's car.

Approximately one hour later, Kristine Brockes came upon Stewart's truck while returning from her job at Ft. Leonard Wood. She found Stewart's body lying face down behind the truck and called the police. Paramedics and law enforcement officers arrived shortly thereafter. Though police were unable to find the murder weapon, they did recover seven .22 caliber shell casings, which were resting in close proximity to one another approximately fifteen feet from Stewart's body. In addition to the shell casings, police found a pile of glass and two spots of blood where Tedder's car had been parked. The next morning, police found an eighth shell casing that had come to rest within a few feet from where the victim's body had been.

The autopsy report revealed that Stewart had been shot in his left wrist, the left side of his belly, his left side, the back of his upper right leg, the right lower leg, the right side of his body, and the left side of the back of his head. While each wound produced varying degrees of internal damage, the wound to the head proved instantly fatal.

The police apprehended Tedder the next morning. Tedder indicated that Johns might have been involved in Stewart's death. While questioning Tedder, the officers noticed two types of damage to Tedder's car: two shattered windows and a puncture to the left rear quarter that looked like a bullet hole. They also found what appeared to be a splatter of blood on

the fender. Local law enforcement began searching for Johns.

Johns had been living on a small farm that was owned by Pearl Rose. When police arrived at the farm, however, Johns was already on the run. The officers searched the premises and recovered several .22 caliber shell casings, which were sent to the Missouri State Highway Patrol Crime Lab and compared to shells found at the scene of Stewart's death. The lab could not confirm that the shells were used in the same gun. But, the lab did identify certain class characteristics of the casings that were consistent with the shells found at the murder scene.

Johns evaded capture for the next six months. During this time, Johns was implicated in two murders and several robberies. On February 7, 1997, Ron Wilson returned to his home to find Johns standing on the front porch with a shotgun that he had just stolen from inside. After firing once into the ceiling and once at Wilson, Johns fled with Wilson's car, two guns, a hunting knife, and a watch. On February 26, 1997, Johns forcibly entered the home of Bud and Melinda Veverka and held the couple at gunpoint while he warmed himself by the stove. This robbery proved largely unsuccessful, as Johns was only able to steal two dollars, a wallet, and some juice. Though no one was injured in these robberies, Johns' next victims were less fortunate.

On February 28, 1997, police found Leonard Voyles lying dead in his Camden County home. He died of a single .22 caliber gunshot wound to the head. An inventory of the home revealed that Voyles' Ford Ranger truck and his .22 caliber rifle were missing. The subsequent police investigation uncovered a shoe print on the property that identically matched Johns' right boot. In addition, law enforcement officers recovered Johns' fingerprints from Voyles' stolen truck, which was found on March 8, 1997. Three miles away, police also found the dead body of Wilma Bragg on March 9, 1997.

The investigation revealed that Bragg's assailant shot her two times in the back of the head while she lay face down on her bed with her hands tied behind her back. DNA testing of a cigarette butt implicated Johns in the murder and impression analysis confirmed that the rifle stolen from Voyles' home was subsequently used to kill Bragg. Johns left with Bragg's 1991 Toyota, which was later recovered with the rifle still inside.

During the following weeks, Johns and his girlfriend, Beverly Guehrer, burglarized four additional homes. At each home, Johns left fingerprints or took property that was later found in his possession.

On April 7, 1997, the crime spree came to an end when officers of the Missouri Water Patrol encountered Johns in a cabin while searching Cole Camp Creek in Benton County. As the officers approached the cabin, Johns threw open the door and emerged with Guehrer held in front of him as a human shield. With one arm around Guehrer's neck and the other aiming a rifle at her head, Johns said, "I've got a hostage. I'll shoot her." As Johns made a sudden movement to escape, Officer Eric Gottman shot him in the abdomen and placed him under arrest.

Johns was taken to Bothwell Hospital in Sedalia. On April 9, 1997, Deputy Robin Peppinger of the Pulaski County Sheriff's Department received permission from the medical staff to conduct an interview. Deputy Peppinger informed Johns of his *Miranda* rights, and Johns confessed that on October 1, 1996, he was with Tedder when a vehicular chase and confrontation occurred on Highway KK. He claimed that Stewart smashed the glass out of Tedder's car and assaulted her. Johns also claimed that he tried to intervene, but Stewart knocked him to the ground. Johns alleged that Stewart reached into his pocket, which prompted Johns to shoot him once in self-defense. Officer Peppinger made an audiotape of the interview.

The State charged Johns with murder in the first degree and armed criminal action on May 22, 1997. In July, Johns informed Deputy John Ward of the Pulaski County Sheriff's Department that he wished to speak to him. Ward again informed Johns of his *Miranda* rights and asked whether Johns would like his attorneys present. Johns declined. In this interview, Johns claimed that he wanted "to get it over with." He mused that the state penitentiary would be less restrictive than his current incarceration. Johns again confessed to the killing of Stewart, but he also claimed that Stewart had threatened to kill him. He gave police the location of the pistol used in the killing, though the weapon was never recovered due to an overgrowth of grass in the area. Johns also confessed to the murder of Leonard Voyles and Wilma Bragg. He described in detail how he shot his victims in the head with a .22 caliber rifle that he had taken from the Voyles home. Finally, he described the location of the two vehicles that he had stolen from the victims.

As the date of trial approached, the trial court heard evidence regarding Johns' mental competency. Johns presented the testimony of Dr. Robert A. Briggs, a neuropsychologist in private practice; Dr. Phillip J. Murphy, a clinical psychologist in private practice; and Dr. Dorothy O. Lewis, a professor of psychology at New York University School of Medicine. The State offered the testimony of Dr. John Zimmerschied, a staff psychiatrist at Fulton State Hospital. All of the expert witnesses agreed that Johns grew up in a troubled home. Johns' father was an alcoholic who had been twice institutionalized at Fulton State Hospital. He subjected the family to persistent abuse, and his wife eventually shot him in self-defense. Johns' mother was also troubled, suffering from chronic depression and anxiety. As a child, Johns endured multiple head injuries and debilitating seizures. His I.Q. was below average and at times fell into the "mentally retarded" classification. He never learned to read or write and began abusing alcohol at the age of fifteen. Johns continued to show memory lapses as an adult. He could not relate the date, his present location, his birth date, his age, or the current President of the United States. Johns also asserted that an Indian spirit helped him evade capture for six months by causing him to become invisible.

Though the State's expert, Dr. Zimmerschied, noted Johns' troubled history and sub-average intellect, he stated that Johns retained the basic reasoning and communication ability to understand the charges levied against him and to aid his attorneys in the preparation of his defense. In his interview with Dr. Zimmerschied, Johns knew the meaning of the terms "guilty" and "not guilty." He understood the roles of the prosecutor, defense counsel, judge, and jury. During the interview, Johns indicated that he committed the crime and wanted to take responsibility for it. Dr. Zimmerscheid observed Johns and found no indications of depression, psychosis, or hallucinations. He specifically noted that Johns was able to communicate appropriately and effectively. Though Johns showed only a "borderline" intellect, Dr. Zimmerschied concluded that Johns was competent to stand trial.

The defense experts disagreed. They concluded that Johns' history, combined with several neurological tests, indicated that Johns was episodically psychotic, delusional, and brain damaged. They reasoned that his learning deficiencies combined with his memory problems and delusions rendered him unable to appreciate the charges or reasonably aid his attorneys. After hearing the testimony, the trial court was persuaded by the opinion of the State's witness. The court found Johns competent to stand trial.

To ensure a fair trial, the trial court determined that the jury should be summoned from outside of Pulaski County. Consequently, jury selection commenced on January 11, 1999, in Adair County.

Though Adair County is more than two hundred miles from Pulaski County, most of the potential jurors were exposed to news accounts concerning the murder and subsequent manhunt. Defense counsel moved the trial court to initially voir dire the 400-member jury pool individually regarding pretrial publicity or, alternatively, to order a second change of venue. The court denied the motion choosing instead to conduct the initial voir dire in panels to screen out any jurors who had formed fixed opinions about the case. During this initial questioning, about 76 people testified that they had not heard about the case, about 98 people testified that they had heard about the case but had formed no opinion or could set aside any opinion that they had formed, and about 226 people testified that they had formed opinions about Johns' guilt or innocence that they could not set aside. The latter group was stricken for cause. After the trial court dismissed the venirepersons with fixed opinions regarding guilt or innocence, the remaining venirepersons were questioned individually. The court, the prosecutor, and defense counsel participated in the individualized voir dire.

The trial began on January 16, 1999. Johns appeared in orange pants and leg braces, which were placed on the outside of the pants at Johns' request. During the trial's "guilt phase," the State presented the evidence specific to Stewart's death-that Johns killed Stewart with a .22 caliber pistol, avoided capture for six months, and confessed to the killing after his apprehension. Johns neither testified nor presented any evidence in his defense. The jury deliberated for six hours and found Johns guilty on both counts.

During the "penalty phase" of the trial, the State submitted two statutory aggravating circumstances to support a sentence of death. First, the State offered Johns' prior conviction of second-degree assault to satisfy the requirement of a "serious assaultive criminal conviction." Second, the State contended that the murder was

committed with "depravity of mind" in that it was outrageously and wantonly vile, horrible, and inhuman due to repeated and excessive acts of physical abuse. Over the objection of defense counsel, the State also called twenty-one witnesses to testify concerning the numerous burglaries and two murders that Johns allegedly committed during the six months that he evaded capture.

As evidence of mitigation, the defense again presented the expert testimony that it had relied upon in the pretrial competency hearing. The expert witnesses argued that Johns should not be put to death because he did not possess the mental capacity to understand the nature of his actions and to conform his conduct to the law. Johns did not attend this portion of the trial presumably due to the nature of the evidence. Defense counsel announced to the court that Johns waived his right to be present, and Johns did not appear for the remainder of the trial. In addition to the expert testimony, the defense presented the testimony of Johns' mother and his sister, who both asked for clemency. The jury deliberated for three hours twenty minutes and recommended a sentence of death, which the trial court adopted. This appeal followed.

## II. *Standards of Review*

■■■ We review the evidence presented at trial in the light most favorable to the verdict. *State v. Clayton*, 995 S.W.2d 468, 474 (Mo. banc 1999). The trial court is vested with broad discretion to admit and exclude evidence at trial. Error will be found only if this discretion was clearly abused. *State v. Middleton*, 995 S.W.2d 443, 452 (Mo. banc 1999).

■■■ On direct appeal, we review the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998). Issues that were not preserved may be reviewed for plain error only, which requires the

court to find that manifest injustice or miscarriage of justice has resulted from the trial court error. *State v. Worthington,* 8 S.W.3d 83, 87 (Mo. banc 1999).

## III. *Issues Raised on Appeal*

On appeal, Johns alleges fifteen points of error. For the sake of convenience, we address his claims in the following order: A) the trial court erred in finding Johns competent to stand trial (Johns' point 1); B) the trial court erred during jury selection by declining a second change of venue, failing to conduct individualized voir dire, refusing to quash two jury panels, and limiting the defense voir dire (Johns' points 3 and 4); C) the trial court erred in overruling motions for a directed verdict and judgment of acquittal based on the State's failure to show deliberation (Johns' points 8 and 9); D) the trial court erred during the guilt phase by excluding evidence of the victim's violent reputation and by admitting evidence of Johns' capture (Johns' points 5 and 7); E) the trial court erred during the penalty phase by admitting evidence of Johns' criminal convictions and unadjudicated bad acts (Johns' points 10 and 13); F) the trial court erred in finding two statutory aggravating circumstances to support the sentence of death (Johns' points 11 and 12); G) the trial court erred by proceeding with portions of the penalty phase in Johns' absence (Johns' point 2); and H) the trial court erred during closing arguments by limiting the defense's argument and by failing to limit the State's argument (Johns' points 6 and 14).

Finally, we conduct an independent review of Johns' sentence in section I and address Johns' claims regarding the proportionality of his sentence and the constitutionality of Missouri's system of death sentence review (Johns' point 15).

### A. Competency

Johns assigns three errors to the trial court's findings of competency. Johns contends that the trial court erred in rul-

ing that he was competent to stand trial, in failing to determine, *sua sponte,* whether Johns remained competent during the trial, and in sentencing Johns to death despite his incompetence. "This is a sensitive constitutional issue. While the law is reasonably clear, the application of the law to the facts of any given case often is very difficult." *State v. Tokar,* 918 S.W.2d 753, 762 (Mo. banc 1996).

 It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Medina v. California,* 505 U.S. 437, 439, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). A defendant is competent when he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). The trial court should investigate the competency of the defendant whenever a reasonable judge in the same situation as the trial judge would experience doubt about the defendant's competency to stand trial. *Tokar,* 918 S.W.2d at 762 (citing *Branscomb v. Norris,* 47 F.3d 258, 261 (8th Cir.1995)). Missouri has codified this standard:

> Whenever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed, he shall, upon his own motion or upon motion filed by the state or by or on behalf of the accused, by order of record, appoint one or more private psychiatrists or psychologists ... to examine the accused....

Section 552.020.2, RSMo 1994.

*1.*

 We find no error in the trial court's pretrial determination of competency. The state's expert, Dr. Zimmerschied, testified that Johns understood the

charges against him, the roles of the various officers of the court, the meaning of a plea bargain, and the penalties that could be levied against him if he were found guilty. Johns indicated that he liked his attorneys and that he could work with them in preparation for the trial. Dr. Zimmerschied found no evidence of psychosis, depression, or continuing hallucinations. He concluded that Johns could effectively and appropriately communicate with his attorneys. Although the defense experts disagreed with this assessment, a mere disagreement among the experts does not necessarily indicate error on the part of the trial court. To the contrary, it is the duty of the trial court to determine which evidence is more credible and persuasive. *See State v. Hampton,* 959 S.W.2d 444, 449 (Mo. banc 1997).

■ Clearly, the trial court found Dr. Zimmerschied's testimony to be more credible and persuasive than the testimony of the defense experts. In testing sufficiency, we do not weigh the evidence but accept as true all evidence and reasonable inferences that tend to support the finding of the trial court. *State v. Wilkins,* 736 S.W.2d 409, 415 (Mo. banc 1987). Dr. Zimmerschied cited more than enough evidence to support his conclusions. For example, he testified that when he asked Johns whether he understood the role of the prosecutor, Johns laughed and replied, "Well, he's the one that can hang me." When he asked Johns about the role of defense counsel, Johns continued the analogy, "He's supposed to try to save my neck." Johns relayed his understanding of the judge as the one who makes the decisions and his understanding of the jury as the people who "hear both sides and make a decision on whether they give me death, let me go, or life without," meaning life without parole. When asked to explain the concept of a plea bargain, Johns said, "that's where they offer me some time, and I agree to take it." Dr. Zimmerschied questioned Johns about his previous courtroom experiences and noted that Johns

displayed "good insight into his current legal situation." Dr. Zimmerschied testified that Johns was able to answer each of his questions in a "logical manner."

Dr. Zimmerschied also observed Johns during his admission to Fulton State Hospital. He testified that Johns' behavior was appropriate at all times during his stay. Johns spent time talking with other patients, playing checkers, and watching television. Dr. Zimmerschied found no evidence of hallucinations or any delusional behavior that would hinder Johns' ability to stand trial. He also testified that Johns' belief in the supernatural was a product of his cultural background and that his beliefs did not appear to influence his behavior.

■ In response to Dr. Zimmerschied's testimony, the defense experts expended considerable time discussing the results of Johns' I.Q. tests. Throughout his life, Johns underwent several I.Q. tests, which resulted in scores ranging from the 60's (mild retardation) to the 80's (below average) on the Wechsler Adult Intelligence Scale (WAIS). Johns argues that his low I.Q. rendered him incompetent to stand trial. This reliance on intelligence scores is misplaced. While such scores could easily be a factor in the trial court's finding of competency, neither this Court nor the United States Supreme Court has found I.Q. results to be conclusive.

The United States Court of Appeals for the Second Circuit addressed the relationship between competency and I.Q. in *United States v. Oliver,* 626 F.2d 254 (2nd Cir.1980). In *Oliver,* the defendant presented evidence to the trial court indicating a "history of heavy drug use, lapses of memory, unresponsiveness, inconsistent answers during interviews with counsel, low intelligence, and unexplained refusal to testify at the trial of his co-defendants." *Id.* at 258. Oliver also reported his WAIS I.Q. score of 68, a score that placed him in the mentally retarded classification. *See id.* at 259, n. 7. Despite the low I.Q. score,

the Second Circuit Court of Appeals found no abuse of discretion in the trial court's finding of competency: "[T]he tests administered to Oliver did not show that he was unable to understand the proceedings against him. His problem was inability to express himself as articulately as might be desired, not an inability to understand the proceedings or to consult with his counsel." *Id.* at 259. As in *Oliver*, we find that Johns' I.Q. scores did not render him incapable of meeting the standard set forth by the United States Supreme Court. There is ample evidence supporting the trial court's finding that Johns had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Godinez*, 509 U.S. at 396, 113 S.Ct. 2680.

### 2.

■ We also find no error in the trial court's failure to conduct a second competency hearing on its own motion. We draw this conclusion after "a careful analysis of the facts of record before and during trial to determine whether medical evidence, other testimony, or the defendant's behavior and demeanor at trial raised reasonable cause for the trial court to order a psychiatric examination." *Tokar*, 918 S.W.2d at 764. In *Tokar*, we contemplated several factors in deciding whether the trial court should have ordered a mental examination on its own motion. We considered whether the defendant's counsel had thoroughly investigated the issue of competency; whether a motion for a competency examination was made by the defendant's counsel during trial; whether the defendant's behavior at trial alerted the trial judge to the defendant's incompetence; and whether affirmative evidence of the defendant's competency was presented during trial. *Id.* As in *Tokar*, we find no error with the trial court's failure to conduct the examination.

Nothing in the record suggests that the trial judge had reasonable cause to believe that Johns had become incompetent to stand trial during the two weeks that separated the pretrial competency hearing and the sentencing. The question of competency was thoroughly investigated and argued by both the prosecution and the defense. Though Johns points to several developments during the trial that he alleges should have alerted the trial court to a change in competency, we find none persuasive. Johns' refusal to wear leg braces under his pants suggests little more than an issue of personal comfort. Likewise, his unhappy demeanor is not evidence that he was incompetent to stand trial. On the contrary, Johns' demeanor may simply show that he fully understood the gravity of the situation. Finally, Johns' choice not to attend certain penalty phase testimony is understandable given the fact that the testimony would concern his childhood abuse, illiteracy, and borderline mental abilities.

Equally pertinent is defense counsel's failure to move for a second competency hearing during the trial. "The failure of defendant or his counsel to raise the competency issue is persuasive evidence that there was no 'bona fide doubt' as to defendant's competency during trial." *Tokar*, 918 S.W.2d at 764 (citing *United States ex rel. Rivers v. Franzen*, 692 F.2d 491, 500 (7th Cir.1982)). When the trial court makes a valid pretrial finding of competency, the trial court need only conduct a second hearing on its own motion when new evidence of incompetence casts doubt upon the original finding. There is no indication of such evidence in this case.

### 3.

■ Because we find that Johns was competent to stand trial, the Eighth Amendment does not prohibit the imposition of a death sentence. *See Ford v. Wainwright*, 477 U.S. 399, 410, 106 S.Ct.

2595, 91 L.Ed.2d 335 (1986).[1] The point is denied.

## B. Jury Selection

In two points of error, Johns alleges that the trial court abused its discretion in overruling defense counsel's motion for a second change of venue, in failing to conduct individualized voir dire concerning pretrial publicity, in denying defense counsel's request to quash two jury panels, and in granting the prosecutor's motion to limit voir dire as to lesser-included offenses. We find no abuse of discretion in the trial court's decisions.

### 1.

 The trial court may order a change of venue if the inhabitants of the county in which the trial is to take place are prejudiced against the defendant. Rule 32.04(a)(1). "The decision to grant or deny a change of venue for cause is a matter of trial court discretion, and its ruling will not be reversed absent an abuse of discretion.... A trial court abuses its discretion when the record shows that the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot occur there." *State v. Hall*, 982 S.W.2d 675, 682 (Mo. banc 1998). In assessing the impact of potentially prejudicial publicity on prospective jurors, the critical question is not whether the jurors remember the case, but whether they have such fixed opinions regarding the case that they could not impartially determine the guilt or innocence of the defendant. *State v. Middleton*, 995 S.W.2d 443, 463 (Mo. banc 1999).

 Roughly 80% of the potential jurors were exposed to publicity in this case. Because of this publicity, Johns alleges that he was deprived of a fair trial despite the fact that all of his jurors testified that they would be fair and impartial. We do not require that jurors be ignorant of the

facts and issues reported by the media. As the United States Supreme Court noted, "In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The relevant question, then, is whether the pretrial publicity "so permeated the community as to render impossible the seating of an impartial jury." *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998).

 In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the United States Supreme Court held that in some circumstances involving extraordinary pretrial publicity or widespread public hostility toward the defendant, the trial court should disregard the jurors' assertions of impartiality. *Id.* at 723–25. This doctrine requires a high threshold of proof that is reserved for extreme situations. *See Pruett v. Norris*, 153 F.3d 579, 585 (8th Cir.1998). Consequently, a mere finding of exposure to pretrial publicity is insufficient to overcome the jurors' assertions of impartiality. As the United States Supreme Court stated:

> The proceedings in these cases [referring to *Irvin* and its progeny] were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

---

1. In this and other of his points relied upon, Johns cites federal and state constitutional provisions, but fails thereafter to specifically mention them in argument. To the extent these citations are not otherwise dealt with in this opinion, they are waived.

*Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). To invoke the doctrine announced in *Irvin*, there must be a "pattern of deep and bitter prejudice" or a "wave of public passion" such that the seating of an impartial jury is impossible. *Irvin*, 366 U.S. at 727–28; *see also McVeigh*, 153 F.3d at 1181.

Johns relies heavily on *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), for the proposition that pretrial publicity alone is sufficient to require a reversal under the facts of this case. Though *Marshall* does present a comparable set of facts, the Court in that case was acting expressly "[i]n the exercise of [its] supervisory power to formulate and apply proper standards for enforcement of the criminal law in the *federal* courts." *Marshall*, 360 U.S. at 313, 79 S.Ct. 1171 (emphasis added). "In the face of so clear a statement, it cannot be maintained that *Marshall* was a constitutional ruling now applicable, through the Fourteenth Amendment, to the States." *Murphy*, 421 U.S. at 798, 95 S.Ct. 2031.

A more appropriate comparison is made to *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). In *Patton*, the Court examined a jury pool in which all but 2 of the 163 venirepersons had heard about the case. *Patton*, 467 U.S. at 1029, 104 S.Ct. 2885. In addition, 126 of the 163 venirepersons said that they would carry an opinion into the jury box. *Id.* Following jury selection, 8 of the 14 jurors and alternates actually seated admitted that at some time they had formed an opinion as to the defendant's guilt. *Id.* One juror and both alternates indicated that they would require evidence to overcome their beliefs. *Id.* In the face of this vast publicity and the predisposition of several jurors, the Court upheld the conviction. *Id.* at 1031–35, 104 S.Ct. 2885. The Court concluded that the passage of time had soothed any public sentiment surrounding the case. *Id.* at 1031–35, 104 S.Ct. 2885. In other words, the Court did not find the "huge ... wave of public passion" similar to that which led to reversal in *Irvin*. *Id.* at 1033, 104 S.Ct. 2885. The Court further noted that as to any individual juror, the question is one of historical fact, "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Id.* at 1036, 104 S.Ct. 2885.

Likewise in *Murphy v. Florida*, the Court addressed a case in which 70 of the 78 prospective jurors were excused. *Murphy*, 421 U.S. at 797, 95 S.Ct. 2031. Of these, 30 were excused for miscellaneous personal reasons, 20 were excused peremptorily by the defense or prosecution, and 20 were excused by the court for having prejudged the defendant. *Id.* Following the selection of the final 8 venirepersons, the trial court overruled a motion to dismiss the jury or change the venue, though the evidence suggested that the jury was exposed to pretrial publicity concerning the defendant's prior convictions for theft and murder. *Id.* One of the jurors even evidenced a predisposition to convict. *Id.* at 801, 95 S.Ct. 2031. Despite these facts, the Court found that *Irvin* did not apply. *Id.* at 803, 95 S.Ct. 2031. Again, the Court did not find a wave of public passion sufficient to overcome the jurors' assertions of impartiality. The Court concluded that the large number of excused venirepersons "by no means suggests a community with sentiment so poisoned against [the defendant] as to impeach the indifference of jurors who displayed no animus of their own." *Id.*

As in *Patton* and *Murphy*, we find no "wave of public passion" in this case. Jury selection took place hundreds of miles from the trial location and almost two years had elapsed between the time of Johns' capture and the time during which the jury was selected. The trial court questioned each of the jury panels concerning the issue of pretrial publicity, and all of the chosen jurors indicated that they

could impartially decide the case based on the evidence presented. Johns has gone to great lengths to show pretrial publicity in this case. But he has failed to show the pattern of deep and bitter prejudice or passion that would lead us to conclude that the jurors were incapable of rendering a fair and impartial verdict. The trial court did not err in declining a second change of venue.

*2.*

■ Johns also alleges that the trial court erred in overruling his motion for individualized voir dire. Specifically, Johns' argument centers on the trial court's refusal to initially voir dire each potential juror individually about exposure to pretrial publicity. Instead, the trial judge addressed the potential jurors in panels to separate those who had heard about the case from those who had not. Those who heard about the case and indicated that they could not be impartial were stricken for cause. The judge then questioned the remaining venirepersons individually concerning their exposure to pretrial publicity, their ability to follow the law, and any conditions that would create an undue hardship. During the individualized voir dire, both the prosecution and the defense had an opportunity to question the potential jurors.

■ Individual voir dire is not required in death penalty cases. *State v. Parker*, 886 S.W.2d 908, 921 (Mo. banc 1994). Whether to conduct voir dire individually or in small groups is a matter within the control of the trial court and is not a basis for reversal of a conviction absent a showing of both an abuse of discretion and actual prejudice to the defendant. *State v. Ervin*, 835 S.W.2d 905, 917 (Mo. banc 1992). The trial court abuses its discretion when its ruling is clearly against the logic of circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consider-

ation. *State v. Brown*, 998 S.W.2d 531, 540 (Mo. banc 1999).

Though Johns argues that the departure of unqualified jurors was "devastating," the record does not establish any indication that the process ultimately effected the jury in any significant way. All of the jurors testified that they could render a fair and impartial verdict based on the evidence presented at trial. The procedure followed by the trial court was approved by this Court in *Brown*, 998 S.W.2d at 546. The trial court did not abuse its discretion by initially conducting voir dire in panels.

*3.*

■ This Court does not disturb the trial court's ruling on juror qualification matters unless it is clearly against the evidence and amounts to a clear abuse of discretion. *State v. Barnett*, 980 S.W.2d 297, 303 (Mo. banc 1998). As noted above, the trial court did not abuse its discretion when it addressed entire panels concerning pretrial publicity and general impartiality. Though panels five and six contained a high percentage of unqualified venirepersons, Johns does not establish that any particular juror was affected by the public dismissal. In fact, although panel five produced four jurors, panel six did not produce a single juror for the trial. The trial court acted within its discretion in declining to quash panels five and six.

*4.*

■ During voir dire, defense counsel attempted to define several lesser-included offenses for the prospective jurors. The State objected, and the trial court instructed counsel to limit his question to whether the prospective jurors would be able to consider lesser-included offenses if so instructed. Such a limitation on voir dire does not constitute an abuse of discretion. "Counsel may not tell prospective jurors what law will be applied in the case or what instructions will be given." *State v.*

*Morrow,* 968 S.W.2d 100, 111 (Mo. banc 1998).

All of the points alleging error in jury selection are denied.

## C. Failure to Show Deliberation

In two points of error, Johns alleges that the trial court erred when it overruled his motions for a directed verdict and judgment of acquittal. He contends that the State failed to state evidence of deliberation in its opening statement or to prove deliberation by the admission of evidence at trial.

■■■■ The crime of first degree murder consists of three elements: (1) knowingly (2) causing the death of another person (3) after deliberation upon the matter. *State v. O'Brien,* 857 S.W.2d 212, 217 (Mo. banc 1993). Deliberation is defined as "cool reflection for any length of time no matter how brief." Section 565.002(3), RSMo 1994. Direct proof of a required mental state is seldom available, and the mental state may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the slaying. *State v. Clayton,* 995 S.W.2d 468, 482 (Mo. banc 1999).

*1.*

■■■■ The State is required to make an opening statement in a criminal case. Section 546.070(1), RSMo 1994. The purpose of the opening statement is to outline the anticipated evidence for the court, the jury, and the defendant. *See State v. Murray,* 744 S.W.2d 762, 774 (Mo. banc 1988). "An opening statement is sufficient when, taken with the reasonable inferences drawn therefrom, the defendant is appraised of the charges against him." *State v. Burkemper,* 882 S.W.2d 193, 197 (Mo. App. E.D.1994). A trial court should direct a verdict against the State in a criminal prosecution on the opening statement of prosecuting counsel *only* when it clearly and affirmatively appears from the statement that the charge against the accused

cannot be sustained under any view of the evidence and *only* when the opportunity to correct or embellish the statement has been given to the prosecutor subsequent to the accused's motion for a directed verdict. *State v. Gray,* 423 S.W.2d 776, 786 (Mo. 1968).

■■■■ In his opening statement, the prosecutor stated that Stewart suffered "seven separate bullet wounds . . . in his leg, in his abdomen, in his side, and in the back of his head behind his left ear." The prosecutor also noted that there were "seven .22 caliber shell casings lying in a fairly small area" and "an additional shell casing in the vicinity. of where [Tommy Stewart] was lying-in the vicinity of where his feet had been at the edge of the roadway in the grass." The prosecutor related the experience of Robert and Christine Dearduff, who arrived while Johns was still at the scene. of the crime. He stated, "They didn't see anyone in the car, but they did see a man down in the road and they did see a person that I believe one of them can identify as the Defendant present at the scene who told them to go on. . . ." Finally, the prosecution discussed Johns' confession, in which he stated, "He threatened to kill me, so I shot him." The prosecutor's statement of anticipated evidence was clearly sufficient to allow an inference of deliberation and to appraise the defendant of the charges against him. Point denied.

*2.*

■■■■ Johns also alleges that the trial court erred in overruling his motion for judgment of acquittal because the evidence was insufficient to support a finding of deliberation. During the trial, the court admitted the following evidence: (1) Johns' confession that he exited Tedder's car with a gun in hand; (2) Sergeant Roark's testimony that he found seven shell casings at the crime scene and that no weapon of any kind was recovered from the victim or the surrounding area; (3) Sheriff Roberts' testimony that he found an additional shell

casing in close proximity to where the victim's body had been; (4) Dr. Dix's testimony that Stewart was shot seven times from different angles, including a fatal blow to the back of the head; (5) Robert Deardeuff's testimony that Johns was present at the scene of the crime after the slaying; (6) Christine Brockes' testimony that Johns was not present at the scene of the crime when she arrived later in the evening; and (7) Officer Gottman's testimony that Johns resisted arrest when he was finally captured.

■ We review the evidence presented at trial in the light most favorable to the verdict. *State v. Middleton*, 995 S.W.2d 443, 452 (Mo. banc 1999). Our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Skillicorn*, 944 S.W.2d 877, 894 (Mo. banc 1997). In this case, the evidence showed that Johns left Tedder's automobile with a deadly weapon and discharged it eight times. There is no evidence that the victim was armed, and the location of the shell casings supports a reasonable inference that the fatal blow was delivered at close range after the victim had been shot a number of times and was lying helpless on the ground. While the jury was not compelled to find deliberation from the evidence, the evidence was clearly sufficient to allow the jury to draw this inference. Point denied.

### D. Guilt Phase Evidence

Johns alleges two points of error concerning the exclusion and admission of evidence during the guilt phase of the trial. Specifically, he contends that the trial court erred in excluding evidence of the victim's violent reputation and in admitting evidence of Johns' capture. We review each of these claims for abuse of discretion by the trial court, which "retains broad discretion over the admissibility of evidence." *State v. Winfield*, 5 S.W.3d 505, 515 (Mo. banc 1999). Error will be found

only if this discretion was clearly abused. *State v. Middleton*, 995 S.W.2d 443, 452 (Mo. banc 1999). A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Brown*, 939 S.W.2d 882, 883 (Mo. banc 1997).

*1.*

■ At trial, defense counsel asked Deputy Robin Peppinger whether the victim had a reputation for drinking. The State objected, citing a lack of relevance. In chambers, the defense made an offer of proof that can be summarized as follows: (1) the victim often drank alcohol; (2) he was known to fight when drinking alcohol; and (3) Johns drank alcohol with the victim from time to time during the seven-month period preceding the murder. The trial court sustained the State's objection and excluded the proffered evidence.

■ When the defendant asserts self-defense, a victim's reputation for violence is generally admissible on the question of who is the aggressor. *State v. Hall*, 982 S.W.2d 675, 681 (Mo. banc 1998). But the defendant must show that he was aware of the victim's violent reputation or of "the specific act or acts of violence." *State v. Waller*, 816 S.W.2d 212, 216 (Mo. banc 1991). In this case, the trial court found insufficient evidence to support the proposition that Johns was aware of the victim's reputation for violence. The only evidence offered by the defense on the issue of John's awareness was the testimony of Deputy Peppinger, who noted that Johns and Stewart "hung out" in the same crowd and drank alcohol together. There is no evidence to suggest that Johns ever witnessed a violent reaction from the victim or heard about the victim's violent behavior toward others. Under these specific facts, the trial court did not abuse its discretion in excluding the evidence. Point denied.

## 2.

Johns also assigns error to the admission of evidence showing that he took Beverly Guehrer hostage immediately before his capture. Although Johns filed a motion *in limine* to exclude the evidence, he did not object at trial and, thus, did not preserve the issue for appeal. Issues that were not preserved may be reviewed for plain error only, which requires the court to find that manifest injustice or miscarriage of justice has resulted from the trial court error. *State v. Worthington,* 8 S.W.3d 83, 87 (Mo. banc 1999).

Johns suggests that evidence of a hostage situation during his capture was not relevant to the murder of Thomas Stewart and was unfairly prejudicial. However, we have held that evidence of flight is admissible to show a consciousness of guilt contrary to any theory of innocence. *State v. Stepter,* 794 S.W.2d 649, 656 (Mo. banc 1990); *see also Middleton,* 998 S.W.2d at 528–29. In this case, Johns took a hostage for the sole purpose of escaping law enforcement. His attempt to flee is relevant to show his consciousness of guilt, and the methodology of his flight is probative as to the quality and depth of this consciousness. The trial court did not commit plain error, or any error, in admitting this evidence. Point denied.

### E. Penalty Phase Evidence

Johns next assigns two points of error concerning the admission of evidence during the penalty phase of the trial. He contends that the trial court erred in admitting evidence of his prior criminal convictions and of several unadjudicated bad acts, including the murder of Leonard Voyles and Wilma Bragg. In reviewing these claims, we note that the trial court is vested with broad discretion in determining the admissibility of evidence offered at the penalty stage of a capital case. *State v. Clayton,* 995 S.W.2d 468, 478 (Mo. banc 1999). "As a general rule, the trial court 'has discretion during the punishment phase of trial to admit whatever evidence

it deems helpful to the jury in assessing punishment.'" *State v. Winfield,* 5 S.W.3d 505, 515 (Mo. banc 1999) (citation omitted).

### 1.

Johns first alleges that the trial court erred in admitting certified copies of his prior convictions: tampering and stealing-March 27, 1987; receiving stolen property-April 13, 1989; and escape-February 22, 1990. Johns argues that these prior convictions are inadmissible due to the state legislature's 1993 repeal of section 565.032.1(3), RSMo 1992. He suggests that by repealing this section the legislature intended to limit the admission of prior convictions to those that support the statutory aggravators outlined in section 565.032, RSMo 1994. This argument is mistaken.

At the penalty phase of a capital case, both the state and defense may introduce evidence of the defendant's character, including evidence of other crimes. *Clayton,* 995 S.W.2d at 478. While section 565.032.1(3) was amended, the present statutory authority for the admission of prior convictions is section 565.030.4, RSMo 1994, which provides, in relevant part:

> Evidence in aggravation and mitigation of punishment, *including but not limited to evidence supporting any of the aggravating or mitigating circumstances listed in subsection 2 or 3 of section 565.032,* may be presented subject to the rules of evidence at criminal trials. Such evidence may include, within the discretion of the court, evidence concerning the murder victim and the impact of the crime upon the family of the victims and others.

Section 565.030.4, RSMo 1994 (emphasis added). This statute permits the admission of all aggravating or mitigating evidence that is admissible under the rules of evidence, whether or not the evidence relates to a section 565.032 statutory aggravator. *See State v. Clay,* 975 S.W.2d 121,

138 (Mo. banc 1998); *State v. Wise*, 879 S.W.2d 494, 520–21 (Mo. banc 1994); *State v. Whitfield*, 837 S.W.2d 503, 512 (Mo. banc 1992). The trial court did not abuse its discretion when it admitted evidence of Johns' prior convictions.

### 2.

Johns further alleges that the trial court abused its discretion in the penalty phase when it admitted evidence of numerous murders, burglaries, and robberies that Johns allegedly committed during the six months that he evaded capture. Johns suggests that unadjudicated bad acts occurring after the murder should not be admissible, that the State introduced too much evidence of unadjudicated bad acts, and that the State provided insufficient notice of its intention to introduce the "bad acts" evidence. We address each contention in turn.

### a.

A separate punishment phase exists in capital cases to permit the presentation of a wide range of evidence about the defendant's past character and conduct, while avoiding the possibility of placing prejudicial or irrelevant evidence in front of the jury before the determination of guilt or innocence. *State v. Nicklasson*, 967 S.W.2d 596, 618 (Mo. banc 1998). The purpose of admitting a wide range of evidence at this phase of the trial is to assist the jury in the serious business of determining the appropriate penalty for each individual. Depending upon the individual, this evidence may or may not help in avoiding the death penalty.

Evidence of the defendant's character and conduct is not limited to criminal convictions. We have clearly held that the jury may consider evidence of a defendant's prior unadjudicated criminal conduct in the punishment phase of the trial. *Winfield*, 5 S.W.3d at 515. Finally, the jury may consider evidence of unadjudicated criminal conduct whether the conduct occurred before or after the offense

at issue. *See Nicklasson*, 967 S.W.2d at 618; *State v. Kenley*, 952 S.W.2d 250, 274 (Mo. banc 1997). The trial court did not abuse its discretion by admitting evidence of the numerous bad acts that Johns allegedly committed while evading capture.

### b.

We have cautioned that the penalty phase should not result in a "mini-trial" of prior offenses. *State v. Whitfield*, 837 S.W.2d 503, 512 (Mo. banc 1992). But the trial court has broad discretion to determine whether the evidence is merely cumulative or whether the evidence assists the jury in weighing the mitigating and aggravating circumstances. *Id.* In this case, Johns alleges that the use of twenty-one witnesses in the penalty phase was "over the top." While this is certainly a large number of witnesses, the State was presenting evidence of six burglaries and two execution-style murders. The quantity of evidence was directly related to the seriousness of Johns' actions after the murder of Stewart. Clearly, the trial court found this evidence "helpful to the jury in assessing punishment." *Winfield*, 5 S.W.3d at 515. We find no abuse of discretion in the quantity of evidence presented during the penalty phase.

### c.

In *State v. Debler*, we held that extensive evidence of serious unconvicted crime is inadmissible where the State provides no timely notice that it intends to introduce the evidence. *State v. Debler*, 856 S.W.2d 641, 656 (Mo. banc 1993), *as interpreted by State v. Chambers*, 891 S.W.2d 93, 106 (Mo. banc 1994). In this case, Johns suggests that the trial court committed a *Debler* violation when it admitted unadjudicated bad acts following two weeks of notice from the State. Initially, we note that Johns did not preserve this issue for appeal. Issues that were not preserved may be reviewed for plain error only, which requires the court to find that manifest injustice or miscarriage of justice

has resulted from the trial court error. *State v. Worthington*, 8 S.W.3d 83, 87 (Mo. banc 1999).

■■■ We addressed an analogous issue in *Moss v. State*, 10 S.W.3d 508 (Mo. banc 2000). In *Moss*, the trial court granted the State leave to endorse two additional witnesses only five days before the trial. In finding no error in the trial court's decision, we considered the following factors:

(1) Whether the defendant waived the objection;

(2) Whether the state intended surprise or acted deceptively or in bad faith, with the intention to disadvantage the defendant;

(3) Whether in fact defendant was surprised and suffered any disadvantage; and

(4) Whether the type of testimony given might readily have been contemplated.

*Moss v. State*, 10 S.W.3d 508, 514 (Mo. banc 2000). In this case, Johns fails to allege any facts that would suggest a different result if the disclosure had occurred more than two weeks prior to trial. The evidence pertaining to the numerous burglaries and murders should have been readily contemplated by trial counsel. As Johns points out, the manhunt received substantial media coverage. We can find no indication that the State acted in bad faith or that the admission of the evidence unfairly surprised the defense. The trial court did not commit plain error under these facts. The point is denied.

### F. Statutory Aggravators

Johns next complains that the trial court erred in finding two statutory aggravating circumstances to support the sentence of

death. First, he contends that the trial court improperly instructed the jury on the "serious assaultive criminal conviction" aggravator. He claims that the instruction violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights because it allowed the trial judge to determine whether the prior conviction was "serious" and "assaultive." Alternatively, he suggests that the trial court's finding was unsupported by the evidence. As to the "depravity of mind" aggravator, Johns asserts that the jury instruction was unconstitutionally vague and that the jury's finding was unsupported by the evidence.

*1.*

■■■ The trial court gave the following instruction concerning the "serious assaultive criminal conviction" aggravator:

In determining the punishment to be assessed against the defendant for the murder of Thomas N. Stewart, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exists:

1. Whether the defendant was convicted of assault in the second degree on February 21, 1989, in the Circuit Court of Cole County, Missouri.

We have repeatedly held that the determination of whether a prior conviction is a serious assault, for purposes of the statutory aggravator, is a matter of law for the court, and the jury need only find as a matter of fact that a prior conviction actually occurred. *State v. Kinder*, 942 S.W.2d 313, 332 (Mo. banc 1996). As in *Kinder*, we conclude that the trial court did not err in finding, as a matter of law, that the prior conviction for second-degree assault was "serious" for purposes of the statutory aggravator.[2] The point is denied.

---

**2.** Johns cites *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), for the proposition that any fact increasing the maximum penalty for a crime must be submitted to a jury and proven beyond a reasonable doubt. However, *Jones* and its progeny specifically distinguish cases in

which the sentencing factor at issue involves a prior conviction. *Jones*, 526 U.S. at 249, 119 S.Ct. 1215; *Apprendi v. New Jersey*, 530 U.S. 466, ——–——, 120 S.Ct. 2348, 2362–63, 147 L.Ed.2d 435 (2000). In addition, because the question at issue is a matter of law as op-

### 2.

█ The trial court gave the following instruction concerning the "depravity of mind" aggravator:

In determining the punishment to be assessed against the defendant for the murder of Thomas N. Stewart, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exists:

2. Whether the murder of Thomas N. Stewart involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You may make a determination of depravity of mind only if you find: that the defendant committed repeated and excessive acts of physical abuse upon Thomas N. Stewart and that the killing was therefore unreasonably brutal.

We have held that the depravity of mind language and limiting instruction provide sufficient guidance to the sentencing jurors such that the instruction is not unconstitutionally vague. *State v.. Ervin,* 979 S.W.2d 149, 166 (Mo. banc 1998). In addition, the aggravating circumstance at issue tracks the language of MAI–CR3d 313.40, which we have held to be presumptively valid. *Id.*

"As to the sufficiency of the evidence to support the aggravating circumstances, the test is whether a reasonable juror could reasonably find from the evidence that the proposition advanced is true beyond a reasonable doubt." *State v. Simmons,* 955 S.W.2d 752, 768 (Mo. banc 1997). In this case, the jury could find beyond a reasonable doubt that Johns shot Thomas Stewart six times as he attempted to escape from his attacker. The evidence also supports the finding that Johns walked up to his victim and shot him in the back of the head as he lay helpless and defenseless on the highway. In short, the evidence is sufficient to support a reasonable finding of repeated physical abuse posed to fact, *Jones* and *Apprendi* are not applicable.

during an unreasonably brutal murder. The point is denied.

### G. Presence of Defendant

█ Johns alleges that the trial court erred when it proceeded with portions of the penalty phase in his absence. Specifically, Johns contends that the trial court should not have relied on the assertion of counsel that Johns did not desire to be in the court and that he waived his right to be present during the presentation of certain evidence during the penalty phase. He argues that the court should have personally addressed him to determine whether he understood his fundamental right to be present during the penalty phase.

This issue is not preserved for appeal. Issues that were not preserved may be reviewed for plain error only, which requires the court to find that manifest injustice or miscarriage of justice has resulted from the trial court error. *State v. Worthington,* 8 S.W.3d 83, 87 (Mo. banc 1999).

Johns remained present during the State's presentation of penalty phase evidence. He also witnessed the testimony of his mother, who appeared by virtue of a videotaped recording. But when the defense offered the testimony of its competency experts, Johns did not appear. The following interplay occurred before the trial judge:

THE COURT: Do you have an announcement for the Court?

[DEFENSE COUNSEL]: Yes, sir, Judge. Mr. Johns has instructed me-or asked me to tell the Court that he prefers not to be in the courtroom for the testimony that we have coming up, and so we would waive his right to be present at this time, and I believe that he understands that.

THE COURT: And you conveyed my message to Mr. Johns that the Court would prefer that he would personally

appear here and he did not wish to do that is that correct?

[DEFENSE COUNSEL]: That's correct, Judge.

Johns did not attend trial during the presentation of the remaining defense evidence, the closing arguments, or the jury's announcement of sentencing. Before each of these three phases, defense counsel made an announcement to the trial court that Johns waived his right to be present.

 The right to be present at critical stages of trial is guaranteed by the United States Constitution, the Missouri Constitution, and Missouri statutory law. *See Middleton,* 998 S.W.2d at 524–26. But like most rights, this right can be waived. *State v. Madison,* 997 S.W.2d 16, 21–22 (Mo. banc 1999). In the absence of evidence to the contrary, the defendant's purposeful absence from the courtroom creates the presumption of a valid waiver. *See State v. Knese,* 985 S.W.2d 759, 776 (Mo. banc 1999). In this case, Johns does not allege that his waiver was invalid. Instead, he complains that the trial court failed to investigate fully whether the waiver was valid. Under these facts, the trial court was entitled to rely upon the direct representations of counsel.

 In addition, Johns failed to raise an objection to his absence at any point prior to this direct appeal. "Failure to assert an objection based upon the right of confrontation at the earliest possible opportunity constitutes a waiver of that objection." *Madison,* 997 S.W.2d at 21. In this case, there is no evidence that trial counsel made a decision that was forced upon his client, and Johns failed to raise any issue concerning the validity of the waiver prior to appeal. The point is denied.

### H. Closing Arguments

 Johns assigns two points of error to the court's rulings during closing arguments. He alleges that the trial court abused its discretion when it sustained ob-

jections to defense counsel's closing argument and when it overruled objections to the State's closing argument. We note initially that the trial court has broad discretion in controlling the scope of closing argument and the court's rulings will be cause for reversal only upon a showing of abuse of discretion resulting in prejudice to the defendant. *State v. Deck,* 994 S.W.2d 527, 543 (Mo. banc 1999). In order for a prosecutor's statements to have such a decisive effect, there must be a reasonable probability that the verdict would have been different had the error not been committed. *Id.*

*1.*

 Johns cites four instances in which he believes that the trial court improperly sustained the State's objections to his guilt phase closing argument. The State first objected to the assertion that Stewart had "chased down" the defendant. The trial court sustained the objection, but allowed the defense to clarify the argument by discussing evidence tending to support a car chase as opposed to a foot chase. The State later objected when defense counsel offered the following argument concerning self-defense: "In order to find Mr. Johns guilty, you have to believe beyond a reasonable doubt that what he told them is absolutely not-is not possible." This argument misstates the law, as the jury could have found that Johns' testimony was "possible" while at the same time finding it wholly incredible. The trial court sustained the objection and allowed defense counsel to correct the misstatement by referencing the appropriate jury instructions.

The third objection followed defense counsel's assertion that the jury could think of many possible scenarios based on the evidence presented by the State. The State objected to the argument and claimed that the defense was asking the jury to speculate. The trial court sustained the objection, but again allowed defense counsel to clarify the statement by

arguing the specific scenario that supported the defense theory. Finally, the State objected to the inference that deliberation required "planning" and "motive." This obviously misstates the law. The trial court sustained the objection and allowed counsel to continue the argument using "cool reflection" as the proper standard.

We find no abuse of discretion in the trial court's determinations. Not only did the trial court properly sustain the State's objections, but the court also allowed defense counsel an opportunity to clarify the objectionable arguments to the jury. In any event, Johns suffered no prejudice from the exchange, and the point is denied.

*2.*

■ Johns next argues that the trial court erred when it overruled his objections to the State's penalty phase closing argument. Specifically, the prosecutor argued, "[I]f this mass of evidence does not warrant the death penalty, I really don't know what else I can do for you." As Johns correctly points out, the prosecutor is prohibited from arguing facts outside of the record. *State v. Storey,* 901 S.W.2d 886, 900 (Mo. banc 1995). In *Storey,* the prosecutor improperly stated that the murder was the "most brutal slaying in the history of this county." *Id.* By making this argument, the prosecutor in *Storey* inferred that he knew the details of all previous murders in the county and that none were more brutal than the murder at hand. Because the record contained no evidence to support the prosecutor's assertion, the argument was impermissible. *Id.* at 901.

■ In this case, the prosecutor did not imply that he was privy to information outside of the record. Instead, he merely expressed his opinion as to whether the death penalty should be imposed. A prosecutor may state his personal opinions on whether the death penalty should be imposed so long as that argument is fairly based on the evidence. *State v. Barnett,*

980 S.W.2d 297, 307 (Mo. banc 1998). Because the prosecutor's argument to impose the death penalty was fairly based on ample evidence, the trial court did not abuse its discretion in overruling the objection.

■ The trial court also overruled Johns' objection to the State's retaliatory argument. In the penalty phase closing arguments, the defense contended that Johns would "be watched by trained armed guards" if he were sentenced to life imprisonment. The record contained no reference to whether prison guards were armed. In response to this impermissible argument, the prosecutor stated, "Well, with the exception of the [guards] on the wall, that's not true. The ones inside are not permitted to be armed." Neither statement alone would be proper unless substantiated by the evidence of the case. Johns argues simply that "two wrongs don't make a right." While this maxim may prove true in many settings, we have concluded that the doctrine of "curative admissibility" allows for the admission of such statements to rebut or explain inferences raised by the prior introduction of inadmissible evidence. *State v. Middleton,* 998 S.W.2d 520, 528 (Mo. banc 1999). A defendant may not provoke reply by arguing outside of the record and then assert error based on the State's retaliation. *See State v. Hall,* 982 S.W.2d 675, 683 (Mo. banc 2000). The point is denied.

## I. Proportionality Review

Finally, Johns contends that his sentence of death is disproportionate under section 565.035, RSMo 1994, and that this Court's treatment of death penalty cases is unconstitutional.

*1.*

■ Section 565.035 requires us to independently review the sentence of death to determine (1) whether it was imposed under the influence of passion or prejudice or any other arbitrary factor; (2) whether there was sufficient evidence to support

the finding of statutory aggravating circumstances and any other circumstance found; and (3) whether the sentence was excessive or disproportionate to the penalty imposed in similar cases considering the crime, the strength of the evidence, and the defendant.

■ Johns argues that passion and prejudice influenced the jury in their decision to impose the death penalty. He points to pretrial publicity and the admission of character evidence as catalysts to the jury's unfair disposition. This argument is not persuasive. As noted above, the trial court did not abuse its discretion when it narrowed the jury pool by screening out any potential jurors with fixed opinions regarding the case. In addition, the trial court did not abuse its discretion when it admitted character evidence during the penalty phase. We find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We next review the trial court's findings to determine if the evidence supports-beyond a reasonable doubt-the existence of an aggravating circumstance and any other circumstance found. Section 565.035, RSMo 1994; *State v. Clayton*, 995 S.W.2d 468, 484 (Mo. banc 1999). In this case, the jury unanimously found two statutory aggravating circumstances as a basis for considering the death sentence. The evidence supports, beyond a reasonable doubt, a finding that Johns was convicted of an assault in 1989 and that the murder of Thomas Stewart involved depravity of mind. Section 565.032.2(1) and (7), RSMo 1994.

■ Lastly, we must determine whether the sentence of death is excessive and disproportionate considering the crime, the strength of the evidence, and the defendant. Section 565.035.3(3), RSMo 1994. In making this determination, we consider similar cases where the death penalty was imposed. *Clayton*, 995 S.W.2d at 484. This Court has upheld sentences of death in similar cases where the defendant evi-

denced a depravity of mind through acts of repeated and excessive physical abuse. *See, e.g., State v. Knese*, 985 S.W.2d 759, 778 (Mo. banc 1999); *State v. Ervin*, 979 S.W.2d 149, 165–66 (Mo. banc 1998); *State v. Johnston*, 957 S.W.2d 734, 756 (Mo. banc 1997); *State v. Taylor*, 929 S.W.2d 209, 222 (Mo. banc 1996). We have also found the death sentence appropriate where the fatal blow is dealt to the victim while the victim is lying injured and helpless, which the facts seem to indicate here. *See, e.g., State v. Middleton*, 995 S.W.2d 443, 467 (Mo. banc 1999); *State v. Tokar*, 918 S.W.2d 753, 773 (Mo. banc 1996). The penalty in this case is neither excessive nor disproportionate.

### 2.

■ In his final point, Johns complains that the proportionality review mandated by section 565.035, RSMo 1994, fails to provide meaningful review and violates his due process rights. We have rejected this argument. *See State v. Middleton*, 995 S.W.2d 443, 468 (Mo. banc 1999). Missouri's system of death sentence review is not unconstitutional. *See Ramsey v. Bowersox*, 149 F.3d 749, 754 (8th Cir.1998) ("Missouri's proportionality review does not violate the Eighth Amendment, due process, or equal protection of the laws."). Johns' final point is denied.

### IV. Conclusion

The judgment is affirmed.

LIMBAUGH, COVINGTON, HOLSTEIN and BENTON, JJ., concur.

WOLFF, J., dissents in separate opinion filed.

WHITE, J., concurs in opinion of WOLFF, J.

WOLFF, Judge, dissenting.

Because I believe Alis Ben (Joe) Johns was deprived of a fair trial with respect to his self-defense theory, I would grant him a new trial and, accordingly, I dissent from the principal opinion's upholding of the finding of guilt.

## The Trial Court Erred on Self Defense

Johns raises two issues of trial court error regarding his claim of self-defense. The first issue is the trial court's refusal to allow evidence of the shooting victim's reputation for violence or aggressiveness when drinking. The second issue asserts trial court error in sustaining the prosecution's objection to the defense argument that Johns and Tedder were being chased by the shooting victim, Thomas Stewart. As I believe the trial court erred in its rulings on both issues, I would grant Johns a new trial.

### Stewart's Reputation for Violence

After his arrest, Johns made a statement to Deputy Robin Peppinger of the Pulaski County sheriff's department. Johns said that on the date of the shooting, October 1, 1996, he was with Deborah Tedder, the girlfriend of the man he later shot, Thomas Stewart, for several hours. Stewart confronted Johns and Tedder, and then Stewart and Tedder argued. Later that night, Stewart saw Tedder and Johns together again. Johns said that Stewart chased them and that the chase ended on Highway KK. On the blacktop of Highway KK, another fight occurred between Stewart and Tedder. Johns said that Stewart smashed the windows of Tedder's car and that Stewart hit Tedder. When Johns attempted to help Tedder, Stewart knocked Johns to the pavement and said something to the effect of, "That's my old lady ... stay out of it."[1] Then—though it is not clear from Deputy Peppinger's brief interview[2] with Johns as to when he received the gun from Tedder—Johns said that he received the gun used to shoot Stewart while inside Tedder's car. Johns said that a shot may have gone off while in the car and that he shot Stewart one time in the heart in self-defense. Johns also said that

Stewart was standing in front of Tedder's car when he shot Stewart and that Johns shot Stewart because he was reaching into his pocket. Johns said that he was drunk at the time of the shooting and that Stewart was intoxicated. Johns fled the scene with Tedder.

An analysis of Stewart's blood alcohol content indicated that he was intoxicated, with a blood alcohol reading of 0.265, over two-and-a-half times the level of intoxication recognized for driving while intoxicated. Section 577.012.[3]

At trial, Johns did not testify on his own behalf. His defense counsel did, however, attempt to introduce evidence of Stewart's reputation for violence in the defense cross-examination of Deputy Peppinger. After the trial court sustained an objection as to Stewart's reputation for fighting when drinking, defense counsel made an offer of proof, through the testimony of Deputy Peppinger, out of the presence of the jury.

On offer of proof, Deputy Peppinger testified that he knew Stewart before participating in the investigation of this incident, that he knew a number of different people whose names came up in the investigation, and that he had lived in the area for quite some time. Furthermore, Deputy Peppinger had reports of Stewart's reputation for violence or aggressiveness and noted that he was known to fight when drinking. In Peppinger's words, "he [Stewart] was known to fight when drinking, sir." Deputy Peppinger testified that he knew this from both law enforcement officers as well as civilians. During the offer of proof, Deputy Peppinger also testified that Johns said he, in fact, knew Thomas Stewart for approximately seven months. Additionally, Deputy Peppinger testified that he knew Johns "ran around in the same crowd with Stewart."

---

1. Deputy Peppinger did not recall the exact quotes used by Johns here, but agreed with defense counsel that the wording was "something to ... [this] effect."

2. Deputy Peppinger characterized his interview of Johns as being brief. Further, he

agreed that it was not a "complete" interview, and in fact the interview was ended because Johns required some form of medical attention.

3. Unless otherwise noted, all references are to RSMo 1994.

In defense counsel's cross-examination of Deputy Peppinger—which precipitated the offer of proof regarding Stewart's reputation for violence while drinking—Deputy Peppinger testified that he had lived in the area for a long time and that he was familiar with quite a few of the people involved in the case. Specifically this included, among others, Alis "Joe" Johns, Deborah Tedder, and Thomas Stewart. Deputy Peppinger testified that all of the people hung around in the same crowd and frequented an area known as Madden Ford, which he described as a "hang-out" and party location for drinking. Counsel then asked about Stewart's reputation for drinking. The court, however, sustained the prosecutor's relevancy objection as to Stewart's reputation.

The prosecutor's objection to the offer of proof was sustained on the grounds that it was irrelevant, because defense counsel had not shown that Johns was aware of Stewart's reputation for violence when drinking.

Where self-defense is an issue, competent evidence may be produced that shows the deceased possessed a reputation as a violent person. *State v. Harden,* 823 S.W.2d 87, 89 (Mo.App.1991) (citation omitted); *see also* William A. Schroeder, Missouri Practice–Missouri Evidence, sec. 404.3(b) (2d ed.1999). A defendant, however, must put forth evidence that he was aware of the decedent's reputation for violence, or the defendant "must show that he was aware of the specific act or acts of violence." *State v. Waller,* 816 S.W.2d 212, 216 (Mo. banc 1991). This can be done by the defendant testifying that he or she knew of the deceased's reputation for violence. But this principle has never[1] *required* that the defendant personally testify to such knowledge.

While Johns did not personally testify that he knew of Stewart's reputation for

violence when drinking, there was a reasonable inference that Johns had such knowledge because, as Peppinger testified, Johns frequently drank with Stewart over a seven-month period. Moreover, Johns knew that Stewart claimed Tedder as his girlfriend; Stewart had confronted Johns and Tedder earlier that evening; and Johns knew that Stewart was drunk. Contrary to the state's argument, this inference is not a huge leap. That Johns knew of Stewart's reputation for fighting when drinking is a rational inference that the jury should have been free to make or not to make based on the evidence in this case.[4]

**Defense Counsel's Closing Argument**

On the self-defense issue, the trial court erred in sustaining the state's objection to the defense argument that Johns was being chased by Stewart. First, there was evidence to support the defense argument. Second, Johns was prejudiced by the court sustaining the objection because it sent the jury a message that there was no chase. Moreover, the subsequent argument by the defense counsel did not cure or overcome the prejudice.

Defense counsel "has the right to make any argument to the jury that is essential to the defense of the accused and is justified by evidence and the reasonable inferences that might be drawn therefrom." *State v. Barton,* 936 S.W.2d 781, 784 (Mo. banc 1996). "It is an abuse of discretion for the trial judge to preclude *any* such argument." *Id.* (emphasis added). As in *State v. Barton,* it is our job to examine the closing argument attempted by defense counsel to determine if it was warranted by the evidence. *Id.* The argument and objection are as follows:

> [**Defense Counsel**]: Don't know-maybe-could have been-not sure. Those are all words from the State's Prosecutor in their closing statement, and that's what

---

4. It should also be noted that this offer of proof was "extracted" during the cross-examination of one of the state's witnesses, and there is a less exacting requirement for such offers of proof. *State v. Joiner,* 823 S.W.2d 50, 52 (Mo.App.1991). This requirement is less exacting because defense counsel cannot be certain how the adverse witness will respond.

this case is about. This case can be summed up this way-on a dark night on a windy highway, when someone has *chased* you down-and I submit to you there is evidence that that was a possibility. (Emphasis added.)

[**Prosecutor**]: Objection, Your Honor. There is *no evidence* in this case of that chase. (Emphasis added.)

[**The Court**]: Sustained.

Here, it is clear that the state's own witness, Deputy Peppinger, testified that, according to Johns, when Stewart confronted Johns and Tedder the second time, "a vehicle chase ensued." [5] And Deputy Peppinger reiterated that a "chase" occurred in defense counsel's cross-examination of him. [6] The evidence was that Stewart chased Johns and Tedder in his truck on Highway KK. When they stopped, Stewart broke out the windows on Tedder's car and knocked Johns to the ground. Thus, clearly there was evidence of a chase. And when the trial court sustained the prosecutor's objection, the jury was in effect told that there was no chase.

The state contends that the prosecutor's objection occurred because the prosecutor thought that Johns' attorney was talking about a foot chase. Perhaps the trial court was under the same impression when it sustained the objection. In any event, it is irrelevant what their impression was, because the evidence supported the argument that there was indeed a chase.

The state also contends that there was no prejudice to Johns for this apparent mistake over whether a chase occurred, because Johns was still permitted to argue to the jury about his statement to the police on the subject of Stewart chasing Johns and Tedder in a truck, forcing them to stop, and the facts of the case that were consistent with Johns' statement. The portion of defense counsel's final argument that the state says cures the prejudice is as follows:

Mr. Johns said in his statement that the State introduced as evidence that Mr. Stewart was behind them and made them stop and the car was parked at that angle. The question is-if someone who-on a dark highway like that, is it unreasonable to be afraid of serious physical injury to yourself or someone else with you-or death? Is that unreasonable? Was it unreasonable of the people out there to think that some harm might come to them? Maybe they would get run off the road. Maybe Mr. Stewart would do something like Mr. Johns said-breaking windows. There's evidence to support that.

What the State has done is they've presented you a scenario where you could come up with a hundred different possible things that could happen on the physical evidence that has been presented to you. They want you to make-take the evidence and make inferences from that evidence, which you are absolutely allowed to do. But they only want you to make one possible inference.

Despite the state's claim that Johns' counsel was able to cure any possible prejudice due to this follow-up statement, Johns' counsel was clearly not able effectively to argue that Stewart "chased them down." To the contrary, the jury heard from both the prosecution and the judge

---

5. Under direct examination by the state, Deputy Peppinger testified that Johns "had been with Ms. Tedder for several hours and made contact somewhere throughout the evening with Mr. Stewart and a vehicle *chase* ensued thereafter, sir." (Emphasis added.)

6. The colloquy between Johns' defense counsel and Deputy Peppinger is as follows:

[**Defense Counsel**]: And that Debbie Tedder didn't stop her vehicle when Mr. Stewart wanted her to.

[**Peppinger**]: Right, sir.

[**Defense Counsel**]: And they had a chase down the back roads in Pulaski County.

[**Peppinger**]: Yes, sir.

[**Defense Counsel**]: And at a point, Mr. Stewart pulled his car in front of their [Johns' and Tedder's] car and essentially made them stop.

[**Peppinger**]: Yes, sir.

that a "chase" did *not* happen. Instead the jury received a much softer version-that "Mr. Stewart was behind them and made them stop and the car was parked at that angle." This is not the equivalent of being "chased down." Worse yet, this all occurred at the beginning of John's counsel's closing argument, which might have left an even stronger impression in the jurors' minds that a chase did not occur.

In summary, Johns was precluded from introducing evidence that was critical to his self-defense theory, and his counsel's argument to the jury was contradicted by the trial court's ruling as to the fact of a chase. The error occurred, and it was certainly prejudicial. Accordingly, I would grant a new trial and, thus, dissent from the principal opinion.