**STATE of Missouri, Plaintiff–Respondent,**

v.

**Ivle Ray MATNEY, Jr., Defendant–Appellant.**

No. 22089.

Missouri Court of Appeals, Southern District, Division One.

Nov. 16, 1998.

Gary E. Brotherton, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, for respondent.

PARRISH, Judge.

Ivle Ray Matney, Jr., (defendant) appeals two convictions for murder in the first degree (Counts I and II), § 565.020,[1] two convictions for armed criminal action, § 571.015.1, and a conviction for robbery in the first degree, § 569.020.1(1). He contends the evidence at trial was not sufficient to prove he committed those offenses. This court affirms.

Defendant waived trial by jury. He was tried by the court.

1. References to statutes are to RSMo 1994.

On review of criminal matters tried by the court without a jury, the standard of review is the same as in cases tried by a jury. *State v. Pollard,* 941 S.W.2d 831, 833 (Mo.App.1997). We accept as true all evidence tending to prove guilt together with all reasonable inferences that support the finding, and all contrary evidence and inferences are ignored. *Id.* We determine whether there was sufficient evidence from which a trier of fact could have found the defendant guilty beyond a reasonable doubt. *State v. Phillips,* 940 S.W.2d 512, 520 (Mo. banc 1997). Moreover, this Court does not weigh the evidence or determine the reliability or credibility of witnesses. *State v. Frappier,* 941 S.W.2d 859, 861 (Mo.App.1997).

*State v. McCarty,* 956 S.W.2d 365, 367–68 (Mo.App.1997). *See State v. Grim,* 854 S.W.2d 403, 405–07 (Mo. banc), *cert. denied,* 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993).

The bodies of Cecil Phillips and Ethel Phillips were discovered inside their house at Malden, Missouri, late in the afternoon of December 18, 1996. Mrs. Phillips' had multiple stab and slash wounds to the head, neck and upper part of her body. Mr. Phillips' had multiple skull fractures and incisions to the neck.

Ethel Phillips had telephoned her granddaughter, Vickie Landers, between 6:00 and 6:30 p.m. December 17; Vickie was watching the news when her grandmother called. They spoke for about 15 minutes. Neighbors saw the Phillips' front porch and yard security lights on until about 11:30 p.m. that night. No one saw them the next day, although one person, Regina Beck, had gone to their house twice that morning, the first time about 9:45 a.m., and knocked on the door but got no response. Ms. Beck heard a television playing inside the house and observed that the front yard gate was partially open both times she was there. She did not close it.

About 6:00 p.m. December 18, Vickie Landers went to her grandparents' house. She noticed that the front gate was partially open. She knocked on the front door but got

no response. Vickie heard a television playing inside. She looked under a curtain on a front window and saw her grandmother's body on the floor beneath a recliner. She went next door to get help. The house next door was the residence of Mr. and Mrs. Terry Gromer. The police were called and Terry Gromer accompanied Vickie back to her grandparents' house where they attempted, unsuccessfully, to force the front door open. Mr. Gromer then broke a window in the front door. He reached inside and unlocked the door. The door was also secured by a wooden board that Mr. Gromer was able to unlatch.

Mr. Gromer stepped into the house, then turned to Vickie to prevent her from seeing what was inside. About that time, Officer Scott Wilson of the Malden Police Department arrived. Officer Wilson entered the house.

Mrs. Phillips' body was in the front room of the house. A recliner-type chair was lying on the top part of her body. A television set in the room was on. It was playing at a loud volume. Officer Wilson drew his weapon and proceeded to search the house. He found Mr. Phillips' body in a hallway and saw bloody footprints on the carpeting near the body. He entered a bedroom that was in disarray—items were on the floor. He then heard a noise from the other bedroom in the house. He entered the second bedroom where he saw the bottom of the bedspread move. There was a small dog under the bed. Officer Wilson proceeded to the back door of the house where he observed what "appeared to be bloody fingerprints on the back door latch."

Officer Wilson called his supervisor, Officer Robert House, when he arrived at the Phillips' residence. Officer House was the second officer to arrive at the scene. He went through the house. He observed that the back door was closed. It had an unlatched hatch or clasp on the inside and a "system" for putting a board across the inside of the door but the board was not in place. Officer House was asked if he observed anything unusual at the back door. He answered, "Only that it didn't have the

two-by-four across it that the front door had."

Highway Patrol Sgt. Dennis Wayne Rainey was called to assist in the investigation as a member of the Dunklin County Major Case Squad. He arrived at the Phillips' residence about 7:00 p.m. He waited outside until other members of the squad arrived. After the other members arrived, they entered the residence and were briefed by Officer Wilson on what he had found. They were shown the location of the victims, bloodstains on the carpet, and "the bedroom area where there was some type of disturbance in the closet area of the bedroom."

Other members of the major case squad who were at the scene were Deputy Sheriff Randy Stone and Missouri Highway Patrol officers Sgt. Gary DeArman, Sgt. A.V. Riehl and Sgt. Gene Cox. After the members of the major case squad were briefed, Officer Wilson left.

Sgt. Rainey and Deputy Stone were evidence officers for the major case squad. Deputy Stone videotaped the scene. Sgt. Rainey conducted a further examination of the premises. There was a cabinet in the hallway above the body of Cecil Phillips. One of its doors was slightly opened. There was a pistol in the cabinet. There were blood smears and spatter on the wall. There were impressions of footwear in bloodstains on the carpet near the feet of the victim. The footprints in the carpeting were photographed and sections of the carpeting with the bloodstained footprints removed. There was a bloodstained vacuum cleaner in the hallway.

Sgt. Rainey proceeded to the southeast bedroom of the residence. There were two beds in the room, one on its east side, the other on the west side. A small safe that officers referred to as a "fire safe" was on the bed on the east side of the room. It was unopened.

There was a closet on the room's north side. Its doors were open. An area of the carpeting inside the closet had been disturbed. There were papers on the floor. Sgt. Rainey pulled the carpet in that area away from the floor. There was a metal lid

in the floor with a hasp on it. The lid was the top of a manufactured safe. It was a round tube set in the floor in concrete. Sgt. Rainey estimated that the safe was "two and a half to three foot deep." It was "[s]ix to eight inches [in] diameter."

Sgt. Rainey testified:

Q. Was there anything in it?

A. Down at the bottom of the safe was a portion of a padlock, a hasp of a padlock, a piece of metal from the top of a padlock.

Q. Did you see anywhere around in that closet a padlock or the remainder of a padlock?

A. Yes, I did. Near the metal lid, there was a padlock that appeared to have been cut.

Q. Okay. Was the portion that was missing from the padlock you found in the closet similar to the portion that you found in the bottom—

A. Yes.

Q. —of the safe?

A. Yes.

Sgt. Rainey observed what appeared to be bloodstain on a handle to an aluminum screen door on the back of the house. There were bolt cutters and a broom by the door. The door led to a small porch. There were tracks in a small amount of snow or ice at the base of the porch.

The keys to the fire safe that had been found on a bed in the master bedroom of the Phillips' residence were in Cecil Phillips' pocket. They were given to Deputy Stone at the autopsy. The safe was opened. There were a number of envelopes in the safe. The envelopes contained $57,442 cash.

Pamela Dawn Slusher was employed at Consolidated Plastics in Bloomfield, Missouri. On December 17, 1996, she worked the second shift. It started at 4:00 p.m. Normally her shift ended at 1:00 a.m. Because it was snowing and the roads were getting bad, she left work that evening around 11:20 to go to her home near Dexter. She was traveling Highway 25. When she was near the intersection of Highway 25 and Route H, she saw a man crawling out of the ditch on the east side of Highway 25. He began flagging her down. She stopped along the east side of Highway 25 and asked if he needed somebody to pick him up. She told him she would "run home and call."

Ms. Slusher told the trial court, "He just kept asking me to take him home, that he didn't live very far and if I would just please take him home." The man gave Ms. Slusher his wallet and told her to take all the money and that she could study his license. Ms. Slusher identified the man as defendant. His license indicated he was 55 years old.

After defendant repeatedly asked her to take him home and told her he did not live far away, Ms. Slusher agreed. She asked to see what was in his pockets. He turned out some of his pockets. He also had a blue duffle bag sitting on the ground. He placed it behind the passenger's seat. He had unzipped it while it was sitting outside. Ms. Slusher could see clothes inside the bag.

Defendant got into Ms. Slusher's car. He told her he had come from his son's house in Clarkton. Ms. Slusher took defendant to his home. The residence was a white trailer with brown trim and a carport. When they arrived defendant produced a roll of money about the size of a soda can. He peeled off two $100 bills and threw them down. Ms. Slusher told defendant she could not accept the money; that she had given him a ride out of the kindness of her heart. She tried to return the money but defendant threw it back on the seat, slammed the door and left.

Charles D. Tipton, Jr., is a wrecker driver in Dexter, Missouri. Shortly after midnight of December 17, he received a call for a wrecker. He went to defendant's residence. He took defendant to the place where defendant's pickup truck had run off the road. Mr. Tipton attached a cable to defendant's vehicle and winched it onto a field road that led to the highway.

Defendant got in his truck and began backing down the field road. He was about halfway down the road when he turned the truck around and pulled back in the field. His truck became stuck again. Mr. Tipton winched the truck out of the field once more. Defendant drove the pickup back to his residence. Mr. Tipton followed. Mr. Tipton

prepared a tow bill and gave a copy to defendant. Defendant paid the invoice with a $100 bill.

Defendant's son, Kevin, had been married to Wendy Phillips. She was Cecil and Ethel Phillips' granddaughter. Wendy lived a good part of her life with her grandparents. She had lived with them until a short time before she married Kevin in 1992. A judgment dissolving the marriage was entered November 13, 1996.

Wendy was familiar with her grandparents' safe. It was installed after she married Kevin. She was not sure when. She also knew her grandfather had another safe, the "fire safe." She testified her grandfather normally kept the fire safe in the closet on top of the safe that had been built into the floor. She had been in the bedroom when he had taken money from the safe.

Wendy testified that Kevin knew the safe was in the closet. Kevin, Wendy and her grandmother had talked about the safe. Wendy's grandmother told her how much money was in the safe but Kevin had not been present when that conversation occurred. Wendy told the court that Kevin was aware that the safe contained money. Wendy told the police defendant disliked her grandparents; that they should talk to him.

Sgt. A.V. Riehl interviewed defendant December 20, 1996, and again December 23. Defendant told Sgt. Riehl he had an argument with his wife and left his residence about 7:00 p.m. December 17; that he intended to drive to his brother's house in Bernie but changed his mind and turned around to return home. Defendant said he slid into the ditch on the return trip; that he walked home after his pickup went into the ditch. Defendant gave Sgt. Riehl the tow bill for getting his pickup unstuck the morning of December 18. Officers estimated the distance from where defendant's pickup slid into the ditch to defendant's house was about five miles.

On December 23, Cpl. Rick Sanders, Deputy J.R. O'Daniell and highway patrol criminal investigator Sgt. Don Windham accompanied the wrecker driver to the field where defendant's truck had been stuck. Sgt.

Windham told the trial court what they found:

Found the—where the accident occurred, we found ruts. Where the vehicle skidded into the ditch and went off into the field, we found a packet full of money. It was $3,000 in a little packet. Found a beer bottle and cigarette, cigarette lighter.

The packet of money that was found was introduced in evidence. Sgt. Windham explained that the money was wrapped with tape in a paper that had "3,000" written on it. He explained that the money was found "just off of 25, west of 25 in a farm—in a field there." He told the trial court the money was found in the field "12 foot from the western-most rut." There were footprints in the area where the money was found. Wendy Phillips identified the writing on the paper in which the money was wrapped as Cecil Phillips' handwriting.

After the money was found, officers went to defendant's residence. When they arrived they observed defendant washing out the inside of his truck. A water hose was laid out. Cpl. Sanders explained, "There was water dripping out of the inside of the doors." The outside of the truck "was dry and very muddy." It had not been washed.

Officers searched defendant's residence December 25, 1996. Cpl. Sanders participated in the search. He recovered various items, including $2,300 currency. Items with Cecil and Ethel Phillips' names on them and torn scraps of note paper were found in a garbage can located under the carport next to defendant's residence. Cpl. Sanders read from the report he prepared concerning the search of the residence:

Okay. "No. 1 through 5 which is the Twin Rivers Regional Medical Center receipt 94053 with Ethel Phillips' name on it found in the garbage can. No. 2, which are receipts of—receipts and/or check stubs from the Professional Administrators or workers' compensation with Cecil Phillips' name on it found in the garbage can. Item No. 3 is a pair of stained gloves found in the garbage can. And No. 4, miscellaneous torn scraps of note paper found in the garbage can. And No. 5 is the clear

plastic bag itself which contained both items No. 1 and No. 2."

Then my narrative, which is Paragraph 6: "Items 1 through 5 were found in a closed garbage can on the carport outside by the front door which is the only door to the residence. After opening the top of the garbage can, we noticed several small plastic sacks tied into knots containing more garbage. Items 1 through 5 were found inside one of the plastic sacks near the bottom of the garbage can."

"Inside this sack there were also several items with both Ivle Ray and Sheila Matney's name on it. One such item was an envelope mailed to Ray and Sheila Matney, 113 East Grant, Dexter, Missouri from Danny J. and Ricky Huffman, Rural Route 2, Box 67–AB, Sorento, Illinois."

"And Item No. 7, which are stained paper towels found in the garbage, were found loose in the garbage also."

The pieces of receipts from Professional Administrators with Cecil Phillips' name on them were admitted in evidence as State's Exhibit No. 2. (They were referred to individually at trial as 2A, 2B and 2C.) The Twin Rivers Regional Medical Center receipt with Ethel Phillips' name on it was admitted in evidence. Wendy Phillips testified that writing on two of the items that were part of State's Exhibit No. 2 was Cecil Phillips' handwriting.

Sgt. Riehl participated in the search of defendant's residence. He testified that he seized an empty boot box from underneath a bed. He did not locate the boots that belonged with the box. The box was marked for identification as State's Exhibit No. 18. Tags that were found inside the box were marked as State's Exhibit No. 18A. Both exhibits were admitted in evidence.[2]

Andy Wagoner, a firearms and tool marks examiner at Southeast Missouri Regional Crime Laboratory, testified that he received the part of the carpet from the Phillips' house that had bloody footprints and compared the imprints on the carpeting with the tread on the soles of a pair of Brahma brand, Canyon Split, size 8 boots secured from a Wal–Mart store for that purpose. Mr. Wagoner was asked the following questions and gave the following answers:

Q. Okay. And what were your findings with respect to the comparisons that you made?

A. The findings were that the lug design of the outer sole on the boots that were submitted produced a similar lug design as that on this carpet.

Q. Now, would you be able—do you have any opinion as to a reasonable scientific certainty as to whether there are class comparisons that are a match?

A. Yes.

Q. And what is that opinion?

A. The class comparisons of the lug design as well as the measurement of the width are the same.

Pamela Johnson, a criminalist employed by Southeast Missouri Regional Crime Laboratory, testified that she compared fingerprints of defendant to an unidentified fingerprint from the tags that were inside the boot box recovered from defendant's residence. She gave the opinion that "the latent print that was on the tag that was contained inside Item 18 [the boot box]" was made by the left index finger of defendant.

■ The evidence was sufficient for the trial court to have found that defendant gained access to the victims' house the evening of December 17, 1996; that he believed the victims kept money in the house. There was evidence from which the trial court could have found that defendant knew the victims maintained a safe inside their residence.

---

**2.** The boot box that was admitted in evidence was not filed with this court. This court was, therefore, unable to inspect its labeling. The state's brief, however, discloses that the box was for "Brahma brand, Canyon Split, size 8 boots." Defendant filed a reply brief in which he does not contest the state's description of the labeling on the box. This court interprets defendant's failure to contest the statement in the state's brief concerning the labeling on the boot box as a concession that the statement is an accurate statement of fact. *See Robinson v. Empiregas of Hartville,* 906 S.W.2d 829, 835 n. 6 (Mo.App. 1995); and *Thornbury v. Morris Oil Co., Inc.,* 846 S.W.2d 238, 239 n. 2 (Mo.App.1993).

The evidence supports a finding that defendant took money wrapped in paper with handwritten notations made by Cecil Phillips; that the money taken included some 100 dollar bills; that defendant lost one bundle of currency taken from the Phillips' residence at the scene where his pickup truck ran off the roadway during the late evening hours of December 17. The evidence further supports a finding that defendant disposed of some of the papers in which currency was wrapped by putting it inside one or more plastic bags and placing the bag or bags in a trash can located in the carport that adjoined his house trailer.

There was evidence from which the trial court could have concluded that defendant got the victims' blood on him while he was in their residence; that he left one or more bloody footprints on the carpeting in the hallway of the residence. The trial court could have concluded that defendant disposed of the boots he was wearing that left the footprint; that he undertook to remove any trace of blood that was transferred from his boots to his pickup truck by washing and soaking the inside of the truck, especially the floor of its cab.

Defendant argues that this case is comparable to *State v. McClain,* 968 S.W.2d 225 (Mo.App.1998), *State v. Janson,* 964 S.W.2d 552 (Mo.App.1998), and *State v. Condict,* 952 S.W.2d 784 (Mo.App.1997), in which evidence was found to be insufficient. The cases arose from the same incident. In each case the named defendant was charged with attempt to manufacture methamphetamine, a controlled substance. All three were present in a building in which the uncle of Janson operated a commercial garage. The arresting officers discovered contraband that evidence showed could be used to manufacture methamphetamine in a closet in the garage building.

In order for the defendants in those cases to be guilty, they had to have possessed the items recovered from the closet in the garage. This court held that the evidence in *McClain, Janson,* and *Condict* was not sufficient to prove the respective defendants possessed the contraband in question. As explained in *Condict* (which is apropos to all three cases):

> [T]he State presented no evidence to establish that Defendant had regular access to, use or control, whether exclusive or joint, of the closet or any other part of the garage building. The evidence only shows that Defendant was one of several people present in the garage when the contraband was found in a nearby closet.

*Id.* at 786.

The fallacy in defendant's reliance on *McClain, Janson* and *Condict* is that the evidence in this case was not limited to the discovery of incriminating items in a location where persons in addition to defendant had access. There were bloody footprints inside the victims' house. The footprints were consistent with the tread on Brahma brand, Canyon Split, size 8 boots. A box for Brahma brand, Canyon Split, size 8 boots was found under a bed in defendant's residence. His fingerprint was found on a tag inside the boot box.

Defendant's conduct in giving different stories concerning his whereabouts and actions the evening of December 17, and his unusual conduct in soaking the inside of his pickup truck with water, was relevant and consistent with findings of guilt. His conduct could be construed as showing a consciousness of guilt and demonstrating the desire to conceal the commission of the offenses of which he was found guilty. *See State v. Isa,* 850 S.W.2d 876, 894 (Mo. banc 1993). *See also State v. Chaney,* 967 S.W.2d 47, 53 (Mo. banc 1998).

Taking all evidence in the light most favorable to the state, it was sufficient to have permitted a reasonable fact-finder to find defendant guilty beyond a reasonable doubt. *See State v. Grim,* 854 S.W.2d at 405–07. The judgment of conviction is affirmed.

PREWITT, P.J., and CROW, J., concur.