**STATE of Missouri, Respondent,**

**v.**

**Andre CLARK, Appellant.**

**No. SD 28072.**

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 19, 2008.

Motion for Rehearing or Transfer
Denied Dec. 11, 2008.

Application for Transfer Denied
Jan. 27, 2009.

Nancy A. McKerrow, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. and Joshua N. Corman, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Andre Clark ("Appellant") appeals his convictions following a bench trial for two counts of the Class A felony of murder in the second degree, violations of section 565.021, and one count of the Class A felony of assault in the first degree, a violation of section 565.050.[1] Appellant was sentenced to three consecutive life sentences for the aforementioned crimes. In his sole point relied on, Appellant challenges the trial court's denial of his motion for judgment of acquittal because there was insufficient evidence adduced at trial to support his convictions. We affirm the judgment of the trial court.

Viewing the evidence in the light most favorable to the trial court's verdict, *State v. Jackson*, 248 S.W.3d 117, 120 (Mo.App. 2008), the record reveals that at approximately 3:40 p.m. on June 17, 2004, Appellant placed three 911 phone calls to the Charleston Department of Public Safety in which he requested police assistance at a home on Grand Street in Charleston, Missouri.[2]

Lieutenant Michael Tarver ("Lieutenant Tarver") and Officer Brandon Caid ("Officer Caid") were the first officers to arrive on the scene. Appellant approached Lieutenant Tarver and told him he had arrived home to find his fiancé, Lazan Balentine ("Ms. Balentine"), lying in a pool of blood. Lieutenant Tarver entered the home and

1. Appellant was initially charged with two counts of murder in the first degree per section 565.020, one count of assault in the first degree, and three counts of armed criminal action under section 571.015. After the State filed its "Notice of Intent to Seek the Death [P]enalty," Appellant entered into a plea agreement with the State whereby he agreed to waive his right to a jury trial in exchange for dismissal of the armed criminal action charges and reduction of the first degree murder charges to charges of second degree murder. All statutory references are to RSMo 2000.

2. All three 911 calls were played at trial. In the first phone call Appellant merely stated his address before hanging up. In the second phone call he "calm[ly]" requested police be dispatched because "some people [ ] ... from [Las] Vegas ... killed [his] fiancé." When asked by the 911 dispatcher when the murder occurred, Appellant responded:

> I came in today [and] I just walked in the house and she [was] laying on the floor in a puddle of blood. And she was telling me last night, when I left about 10:00 last night that she's seen people[ ] in a car that ... she recognized them and she told me that her past had caught up with her, and I said what [do] you mean by that, and she said that she had [done] something in [Las] Vegas and the people there had caught up with her now and they killed my fiancé.

Appellant thereafter called 911 a third time. In the third phone call, Appellant, who was crying and upset, again requested police assistance and was told it was on the way.

discovered Ms. Balentine lying on the floor in the kitchen with severe injuries to her ·head and body.[3] Lieutenant Tarver testified Ms. Balentine was clearly deceased and there was blood on a couch near her body as well as blood splatter all over the walls, back door and ceiling. He stated there were also two broken broom handles lying near the body.

When Lieutenant Tarver spoke with Appellant, Appellant told him that when he last saw Ms. Balentine in the late evening of June 16, 2004, "she had told him that she thought she had ... seen somebody from Las Vegas from her past, and that her past had caught up with her." He stated that after speaking with Ms. Balentine that night he left home and spent the night at someone else's house.

Appellant thereafter told the officers that he had gone home earlier that morning of June 17, 2004, between 6:00 a.m. and 6:30 a.m. to adjust the thermostat, which was in the hallway across from the kitchen.[4] He stated he did not see Ms. Balentine's body at that time because he had just "reached around the corner to shut the thermostat ..." off and had not actually gone into the kitchen.[5] He also related he came back to the home later in the morning, between 9:00 a.m. and 10:00 a.m. to move a freezer to a shed.

Officer Caid eventually asked Appellant if there was anyone else in the home. Appellant replied that he did not know where Ms. Balentine's two sons were. Both officers then began a search for the children. In a back bedroom, "between the north wall of the bedroom and the bed," they located a four-year-old boy, Knighten, who was severely injured.[6] In

3. There was medical testimony at trial that Ms. Balentine had suffered "numerous" blows to her head which crushed her skull; she had a large visible fracture in her forehead through which brain tissue had discharged; there were "four major wounds to the right upper head" and "three other [wounds] in the scalp portion" of her head; "there were at least three injuries to the right side of the face ...;" there were numerous contusions, imprints and abrasions on her chest and abdomen which were "rod shaped;" there was a "large abrasion to the front of the chest;" there was severe damage to the internal organs and soft tissue; her jaw was broken in several places; she had defensive wounds on her hands; and her left hand was broken in several places. There was also evidence that some of Ms. Balentine's wounds were inflicted post-mortem. The doctor who performed her autopsy opined that she was most likely killed with "a long, rod shaped, or board shaped implement, ... a little less than an inch and a quarter in diameter" that "had to have been ... long enough and sturdy enough to not only break ribs, and tear the liver inside, but ..." also cause the injuries to the head.

4. Appellant would later state that he had returned home at 10:00 a.m. instead of at 6:00 a.m. to 6:30 a.m.

5. Sergeant Scott Stoelting ("Sergeant Stoelting") testified at trial that from the location of the thermostat in the hallway there were blood splatters visible on the wall and floor of the kitchen.

6. Knighten was taken to the hospital in Sikeston, Missouri. When he arrived "[h]e was unconscious, making no purposeful movements;" he had "a large hematoma on the left side of his forehead ...;" he had a fractured skull; and his "pupils were unequal in size." The doctors in Sikeston were fearful Knighten would not survive his injuries and he was sent by ambulance to Cardinal Glennon Hospital in St. Louis for additional care.

After his immediate medical needs had been met at the hospital in St. Louis, Knighten remained in the hospital for rehabilitation because he could not walk or speak, he had a bone flap on his skull which allowed for swelling of his brain, and one eye was swollen shut. One of his nurses detailed a situation where Knighten saw a photograph of Appellant which was kept at the nurse's station for

the same room, they found a deceased four-year-old boy, Kyri, under the blankets of another bed.[7]

After speaking with several officers on the scene, Appellant agreed to accompany Sergeant Stoelting and Sergeant Heath[8] of the Missouri Highway Patrol to the Charleston police department for further questioning. There, Appellant repeated his assertion that Ms. Balentine had recently been in trouble in Las Vegas and that a hit man from Las Vegas had probably killed her.[9]

Appellant also informed the officers that Kyri and Knighten had been with him the previous evening of June 16, 2004, from approximately 6:00 p.m. until 10:00 p.m. He stated they spent most of the evening at his friend Gloster McCline's ("Mack")

house and then he took the boys home.[10] He stated when he dropped the boys off at home and started to leave again Ms. Balentine got angry that he was going back out. He told her not to worry about where he was going and he returned to Mack's house to smoke crack for the rest of the night. He told the officers that he did not return home that evening.[11]

In connection with his stay at Mack's house, Appellant also related he slept on Mack's couch until 9:00 a.m. on the morning of June 17, 2004, when he left Mack's home. Then at 10:00 a.m. that morning he stated he went by his home to turn the thermostat down, which was about four hours later than the time he originally told police he returned to the home. He related he did not go into the kitchen at that

security purposes. She stated when the child saw the photograph of Appellant his demeanor immediately changed and "he didn't move, didn't speak, didn't say anything, he just sat, became solemn, very quiet." There was additional evidence that when asked about the events of the night in question Knighten would become frightened, nervous, scared, and he would cover his face.

Shortly after recovering from his original injuries, Knighten fell on the playground at school and received a severe concussion. As a result of the concussion, he developed a brain infection which rendered him unable to speak, communicate, manipulate his body parts or control his bodily functions. At the time of trial, he was in the intensive care unit on life support and oxygen support; accordingly, he did not testify at trial.

7. The doctor who performed Kyri's autopsy testified that the child had "swelling about both eyes ...;" "a little bleeding from the medial aspect of the right eye;" "a compressed skull fracture ...;" "a piece of the bone had lacerated his brain on the right frontal lobe and caused hemorrhage ..." to his brain; and there were contusions "indicating three different blows were struck, at least." The doctor opined that the injuries could have been the result of "a blow, and it could also be [from] the head striking a hard object." Kyri's death certificate indicated he

died as the result of being "beaten with a blunt object as he lay in bed...."

8. Sergeant Heath's first name does not appear in the record.

9. The officers were unable to confirm Appellant's report that Ms. Balentine had been in trouble while in Las Vegas. They spoke with both members of her family and law enforcement personnel in Las Vegas and were unable to find out anything which would support Appellant's assertions.

10. Tammy Murray ("Ms. Murray") testified she was present at Mack's house that evening when the children and Appellant were there. She stated she cared for the children while Appellant smoked crack. She related that when Appellant left with the children he was "dragging" them down the street such that their "feet w[ere not] hitting the ground." Ms. Murray also testified that she encountered Appellant at the courthouse following his arrest for the crimes at issue and he threatened her by telling her "that [she] better not say[ ] nothing" to the police about him.

11. Later, Appellant changed his story and told Sergeants Stoelting and Heath that at some point after he dropped the boys off he did return home to get a television set, which he sold for crack.

time and did not see anyone at the home. He then went to Perryville[12] and Sikeston with his friend, Tim Easton ("Mr. Easton"). He informed the officers that he got back from Sikeston at exactly 12:44 p.m.

Appellant also reported to the authorities that he then met up with Oscar Davis ("Mr. Davis") and they went to Wal–Mart to get fried chicken after which, at about 2:00 p.m., he waited at McClain's grocery store for a woman who wanted to purchase a freezer located at his home. He stated they went to his home to look at the freezer, but he said he did not go inside the residence at that time. Appellant then returned to Mack's house after meeting with the woman. Appellant also related that at some point between the late evening of June 16, 2004, and the early afternoon of June 17, 2004, he changed his shorts and socks, but he was wearing the same shirt from the night before.[13]

Lastly, Appellant informed the authorities that he had remained at Mack's house until around 3:45 p.m. on June 17, 2004, when he then returned home and discovered Ms. Balentine's body in the kitchen.

The record also shows that after interviewing Appellant, Sergeant Stoelting was informed that Appellant had reportedly sold Ms. Balentine's EBT card to a woman on June 17, 2004.[14] Sergeant Stoelting then inquired of Appellant concerning the card and it was then that Appellant admit-

ted he sold the card for $130.00 so that he could purchase crack cocaine.

Thereafter, Appellant was informed of his *Miranda*[15] rights. He confirmed he understood those rights, signed the waiver of rights form and continued to speak with the officers.

At trial Sergeant Stoelting testified that he had asked Appellant if he had killed Ms. Balentine and Kyri. Appellant stated he had not. Sergeant Stoelting then testified that Sergeant Heath had asked Appellant if this was "the first time [he had] ever done something like that, and [Appellant] said yes." The officers then informed Appellant that "one of these days you're going to have to tell your side of the story of what happened" and Appellant responded that "he knew that he would have to tell his side of the story, but he wasn't ready to tell it right now." The officers then ended the interview and returned Appellant to jail.

Also, at trial Mr. Davis testified that he was with Appellant and the children during the evening of June 16, 2004. He stated he took Appellant to McClain's grocery store that evening because Appellant wanted to sell Ms. Balentine's EBT card. He related that a woman purchased the card from Appellant and Appellant used the money to pay him for gas and to buy a carton of cigarettes. Mr. Davis stated he then took Appellant to purchase crack co-

---

**12.** Appellant initially told officers he had gone to Hayti, but changed his story when confronted by the officers.

**13.** Ms. Murray testified that Appellant came back to Mack's house around 2:00 a.m. on June 17, 2004, to smoke crack. She stated when she saw him earlier in the evening he had been wearing blue jean shorts and when she saw him this time he was wearing beige shorts.

**14.** As best we discern an EBT card is some form of a gratuitous, government-supplied credit card used for purchasing food.
Patricia Cooper ("Ms. Cooper"), the woman who purchased the EBT card from Appellant, testified that she purchased the card on June 16, 2004, and kept the card overnight in order to use the funds on it. She stated Appellant got the card back from her on June 17, 2004, at McClain's grocery store.

**15.** *Miranda v. Arizona*, 384 U.S. 436, 455, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

caine and then transported Appellant and the two boys to Mack's house at around 8:30 p.m.

Mr. Davis further related that later that evening of June 16, 2004, Appellant approached him in a parking lot and asked him if he knew anyone who would buy a television. Mr. Davis then drove Appellant to Appellant's home and Appellant went inside to retrieve a television. When Appellant emerged with the television, Mr. Davis asked him what Ms. Balentine "would ... think about him getting that T.V. out of [the house]" late at night and Appellant responded that "he didn't have to worry about her anymore." Mr. Davis testified Appellant later traded the television for crack cocaine and then he took Appellant back to Mack's house.

The following day, June 17, 2004, Mr. Davis and Appellant went to McClain's grocery store to retrieve Ms. Balentine's EBT card from Ms. Cooper at between 12:30 p.m. and 1:00 p.m. Then at around 1:30 p.m. they met a woman at Appellant's home who wanted to look at a freezer. Thereafter, Mr. Davis took Appellant to sell some children's DVDs, which he was able to sell for $8.00. Mr. Davis then testified they went back to Appellant's home to wait for a man who was going to "pick up" a car from Appellant and, when the man departed with the car, Mr. Davis and Appellant went to a house to look at a freezer. Mr. Davis returned Appellant to his home between 3:00 p.m. and 3:30 p.m.

Eric Cassell ("Mr. Cassell") testified that he lives near Mack's house. He testified that during the evening of June 16, 2004, he was sitting on his porch when Appellant approached him between 10:00 p.m. and 11:00 p.m. Mr. Cassell testified that Appellant had a stack of children's videotapes and DVDs he wanted to sell and Mr. Cassell advised him he could probably sell the DVDs at a parking lot down the street.

Robert Gipson ("Mr. Gipson") testified that on that same evening he was at Mr. Cassell's house when Appellant came over and spoke with them. He stated he did not know Appellant well, but he knew Appellant was often selling appliances out of his house. He stated that when Appellant approached them he was carrying a "small stick" in his hand which was similar in size to an ax handle or maybe smaller.

Terry Parker, the county coroner, testified that he estimated Ms. Balentine and Kyri were murdered at approximately 10:00 a.m. on June 17, 2004.

Appellant did not testify at trial. He offered the testimony of Jeff Rickey, the asset protection manager for Wal–Mart in Sikeston, to testify that police personnel did not request to view the store security tapes for June 17, 2004, despite the fact that Appellant reported he had been in the store that day. Additionally, Steve Gorostiza ("Mr. Gorostiza"), who is in charge of monitoring the security cameras for McClain's grocery store, testified that the police reviewed his store's security tapes for both June 16–17, 2004. He testified that the videotape shows Appellant was in the store wearing a white t-shirt on June 16, 2004, at 7:32 p.m. and on June 17, 2004, at 11:45 a.m. Mr. Gorostiza testified that the man in the video had hair and Appellant appeared at trial with a shaved head, but he still believed it was him in the videotape. Further, Appellant's father testified that it was Appellant on the McClain's grocery store security videotape and that at the time of the homicides Appellant did not have a shaved head.

At the close of all the evidence, Appellant filed a motion for judgment of acquittal which was denied by the trial court. Thereafter, the trial court found Appellant guilty of two counts of the Class A felony

of murder in the second degree and one count of the Class A felony of assault in the first degree. He was sentenced as previously related. This appeal followed.

"In a court-tried criminal case, the court's findings have the force and effect of a jury verdict. 'Therefore, the standard used to review the sufficiency of the evidence in a court-tried and a jury-tried criminal case is the same.'" *State v. Mitchell,* 203 S.W.3d 246, 249 (Mo.App. 2006) (quoting *State v. Fraga,* 189 S.W.3d 585, 586 (Mo.App.2006)) (citations omitted). "'We review the denial of a motion for acquittal to determine if the State adduced sufficient evidence to make a submissible case.'" *State v. Smith,* 185 S.W.3d 747, 758 (Mo.App.2006) (quoting *State v. Howard,* 973 S.W.2d 902, 906 (Mo.App.1998)). "Where Appellant contests the sufficiency of the evidence to support his conviction, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable trier-of-fact might have found Appellant guilty beyond a reasonable doubt." *State v. Holman,* 230 S.W.3d 77, 83 (Mo.App.2007); *see State v. Silvey,* 894 S.W.2d 662, 673 (Mo. banc 1995). This Court is required to take the evidence in the light most favorable to the State; to grant the State all reasonable inferences from the evidence; and to disregard contrary inferences. *State v. Waller,* 163 S.W.3d 593, 595 (Mo.App.2005). "'The credibility and weight of testimony are for the fact-finder to determine. The fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case.'" *Holman,* 230 S.W.3d at 83 (quoting *State v. Crawford,* 68 S.W.3d 406, 408 (Mo. banc 2002)). "'The function of the reviewing court is not to reweigh the evidence, but only to determine if the conviction is supported by sufficient evidence.'" *State v. McCleod,* 186 S.W.3d 439, 443 (Mo.App.2006) (quot-

ing *State v. Mann,* 129 S.W.3d 462, 467 (Mo.App.2004)).

As noted by the State in its brief, "[o]ther than Appellant's admission that this was the first time he had done something like this, and that he was not ready to tell his side of the story . . ., this is a circumstantial evidence case."

■■ "Circumstantial evidence is afforded the same weight as direct evidence." *State v. Hutchison,* 957 S.W.2d 757, 767 (Mo. banc 1997); *see State v. Grim,* 854 S.W.2d 403, 406 (Mo. banc 1993). "'Even where evidence of a defendant's guilt is solely circumstantial, the evidence is sufficient to support a conviction if the evidence is such that a reasonable juror would be convinced beyond a reasonable doubt of the defendant's guilt.'" *State v. Myszka,* 963 S.W.2d 19, 23 (Mo.App.1998) (quoting *State v. Bragg,* 867 S.W.2d 284, 290 (Mo.App.1993)); *see State v. Daniels,* 179 S.W.3d 273, 286 (Mo. App.2005). "'All of the elements of a homicide case . . . may be proved with circumstantial evidence.'" *Myszka,* 963 S.W.2d at 23 (quoting *State v. Baker,* 859 S.W.2d 805, 813 (Mo.App.1993)). "'[E]ven in a homicide case, the circumstances need not be absolutely conclusive of guilt and they need not demonstrate the impossibility of his innocence; the mere existence of other hypotheses is not enough to remove the case from the . . . trier of fact.'" *State v. Williams,* 66 S.W.3d 143, 153 (Mo. App.2001) (quoting *State v. Applegate,* 668 S.W.2d 624, 631 (Mo.App.1984)).

Any societal distrust of circumstantial evidence has long been abandoned. We no longer need to hold circumstantial evidence cases to a higher standard than direct evidence cases. If [the fact finder] is convinced beyond a reasonable doubt, so long as the evidence meets the minimal appellate standard required by

due process, we need not disturb the result simply because the case depended wholly, mostly, or partially upon circumstantial proof.

*Grim,* 854 S.W.2d at 406; *see also State v. O'Haver,* 33 S.W.3d 555, 560 (Mo.App. 2000).

Appellant asserts that in this circumstantial evidence case the State was required to prove something more than the fact that Appellant was present at the home where the bodies were found and that he had the opportunity to murder Ms. Balentine and Kyri as well as to attack Knighten. While we agree that his "mere presence at the scene of the crime or his mere opportunity to commit the crime will not, without more, constitute circumstantial evidence sufficient to justify a conviction," it has been held that "if the State shows presence, opportunity, and *additional circumstances consistent with the commission of the crime ...*" sufficient evidence has been adduced to support the conviction. *State v. Gordon,* 915 S.W.2d 393, 396 (Mo.App.1996) (emphasis added). It is clear that " '[a]lthough isolated facts viewed individually may not support more than a suspicion of guilt, a conviction may rest upon accumulated, inter-dependent facts, no one of which may create more than a suspicion of guilt.' " *State v. Parsons,* 152 S.W.3d 898, 905 (Mo.App.2005) (quoting *State v. Plant,* 694 S.W.2d 751, 755 (Mo.App.1985)).

Here, the accumulated facts and circumstantial evidence are sufficient to support Appellant's conviction beyond a reasonable doubt.

Throughout his dealing with law enforcement authorities in this matter, Appellant gave varying versions of his whereabouts during the two day period of time at issue; there were gaps in his explanations; and there was contradictory testimony from various witnesses. For example, Appellant told police he had not returned to the home he shared with Ms. Balentine on the night of June 16, 2004, after he returned the boys to the home, but later he stated he had indeed returned to pick up a television set to sell for crack cocaine. Also, at the scene Appellant originally informed officers he had returned home at 6:00 a.m. on June 17, 2004, to turn down the thermostat, but later at the police station stated he had done so at 10:00 a.m. It has long been held that "inconsistent statements to the police demonstrate consciousness of guilt." *State v. Gonzalez,* 235 S.W.3d 20, 30 (Mo. App.2007); *see also State v. Chaney,* 967 S.W.2d 47, 53 (Mo. banc 1998). " 'A permissible inference of guilt may be drawn from the acts or conduct of a defendant, subsequent to an offense, if they tend to show a consciousness of guilt and a desire to conceal the offense or a role therein.' " *Chaney,* 967 S.W.2d at 53 (quoting *State v. Isa,* 850 S.W.2d 876, 894 (Mo. banc 1993)).

Additionally, Appellant told police that when he returned home to turn down the thermostat he did not see any blood. However, Sergeant Stoelting testified that blood splatters on the floor and wall were clearly visible from the location of the thermostat. Viewing this evidence in a light most favorable to the verdict, we can infer that the trial court found Sergeant Stoelting's testimony more credible than Appellant on this issue. *See Chaney,* 967 S.W.2d at 53–54.

Also, Appellant gave a different account of his whereabouts on June 17, 2004, than that offered by Mr. Davis. Appellant reported to police that on June 17, 2004, he met up with Mr. Davis shortly after 12:44 p.m. at which time they went to Wal–Mart in Sikeston to purchase fried chicken and then to McClain's grocery store. Mr. Davis testified that he picked Appellant up

at between 12:30 p.m. and 1:00 p.m., but did not take him to Wal–Mart but, instead, took him immediately to McClain's grocery store so that he could retrieve Ms. Balentine's EBT card from Ms. Cooper.

More importantly, there was evidence that there may have been domestic issues between Appellant and Ms. Balentine around the time of the crimes at issue. Appellant told police that Ms. Balentine was angry at him when he left the house at 10:00 p.m. on June 16, 2004, because he was going back out so late at night. He told them that he told her not to worry about where he was going and he went off to smoke crack cocaine. Also, Ms. Murray testified that Appellant was treating Kyri and Knighten roughly earlier in the evening and was dragging them down the street.

Further, in the twenty-four hour period leading up to Appellant's 911 calls, he spent a great deal of time smoking crack and harvesting items from his home to sell for crack. He sold Ms. Balentine's EBT card, the children's DVDs and videotapes, and the family's television set between the late afternoon of June 16, 2004, and the early afternoon of June 17, 2004. He even informed Mr. Davis that he was not worried about Ms. Balentine's reaction to his taking the television in the middle of the night because "he didn't have to worry about her anymore." Significantly, Appellant had not mentioned selling Ms. Balentine's EBT card or taking the television from the home during the evening of June 16, 2004, until he was confronted with these facts by police during questioning. Further, the medical evidence suggested that the victims were attacked with a rod-shaped object approximately an inch in diameter and Mr. Gipson saw Appellant on the night of June 16, 2004, carrying a "stick" or object similar in size to an ax handle. Appellant's "conduct in giving different stories concerning his whereabouts and actions ... and his unusual conduct [around the time of the crimes] was relevant and consistent with findings of guilt." *State v. Matney,* 979 S.W.2d 225, 231 (Mo. App.1998). Such "conduct could be construed as showing a consciousness of guilt and demonstrating the desire to conceal the commission of the offenses of which he was found guilty." *Id.*

Also, Appellant's three 911 calls were played for the trial court. Appellant's first two phone calls were very calm, given that he had just found the body of his fiancé in the kitchen floor, and he merely asked for police assistance as opposed to asking for an ambulance to be dispatched. When asked "when" the crime occurred during the second phone call, Appellant recited the story later given to police about Ms. Balentine getting into trouble in Las Vegas. While Appellant became emotional during the third phone call, when police arrived at the home Appellant was calmly sitting in a chair in the front yard. Curiously, there was no evidence Appellant had attempted to aid Ms. Balentine or had gotten close enough to the body to determine if she was alive in that there were no tracks in the blood surrounding the body and there was no blood on Appellant. Additionally, the police investigated Appellant's story about Ms. Balentine's possible problems or issues in Las Vegas and was unable to find any evidence that she had been in trouble during her stay in Nevada.

Lastly, there was testimony from Ms. Murray that Appellant approached her after he was charged in this matter and told her not to say anything about him to anyone. Evidence of threats by an accused toward a witness against him may be adduced in order to establish consciousness of guilt in that "threatening remarks ... are inconsistent with the demeanor of an innocent person...." *State v. Frey,* 897

S.W.2d 25, 36 (Mo.App.1995) (quoting *State v. White*, 870 S.W.2d 869, 875 (Mo. App.1993)).

As previously related, "[a]n appellate court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Chaney*, 967 S.W.2d at 53–54 (quoting *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "The conviction in this case would require reversal only under a rule that the prosecution was under an affirmative duty to disprove every reasonable hypothesis except that of guilt." *Id.* at 54. Looking solely at the evidence and inferences that support the verdict in the present matter, as we are required to do, we reject Appellant's challenge to the sufficiency of the evidence to support his convictions. The trial court did not err in denying Appellant's motion for judgment of acquittal in this case. Point denied.

The judgment and sentence of the trial court are affirmed.

BATES, J., and SCOTT, P.J., concur.