**STATE of Missouri, Respondent,**

v.

**Jamel WHITT, Appellant.**

**No. ED 92578.**

Missouri Court of Appeals,
Eastern District,
Division Four.

March 9, 2010.

Timothy Forneris, St. Louis, MO, for appellant.

Chris Koster, Atty. Gen., Daniel N. McPherson, Jefferson City, MO, for respondents.

GARY M. GAERTNER, JR., Judge.

### Introduction

Jamel Whitt appeals from the trial court's judgment, following a bench trial, convicting him of two counts of the Class A felony of murder in the first degree degree in violation of Section 565.020 RSMo 2000.[1] We affirm.

### Factual and Procedural Background

The complaint charging Defendant was filed April 24, 2005. On or about April 25, 2005, the trial court issued the following order:

> Defendant appears confined in open court having been unresponsive to the Public Defender's efforts to interview him, having been on overnight suicide watch and having acted out in court in a manner to suggest the need for a mental evaluation. Whereupon the court orders the Public Defender's office to represent the defendant, that he be taken for a psychiatric examination, that he be provided his prescribed medications . . . as determined necessary and that he be maintained on a suicide watch.

The trial court also granted Defendant's Motion for Appointment of Psychiatrist, continued the cause, and committed Defendant to the Department of Mental Health (DMH) for a mental examination pursuant to Sections 552.020 and 552.030. Defendant's cause was removed from the trial docket and placed on the Mental Examination Docket on April 25, 2005.

---

1. Subsequent statutory citations are to RSMo 2000, unless otherwise indicated.

At a certification hearing held on July 25, 2005, Defendant filed a Motion to Declare the Defendant Incompetent. Based on a previously-filed psychiatric evaluation report and the record, the trial court found that Defendant lacked the mental fitness to proceed and ordered the cause suspended. The court ordered that the Defendant be committed to DMH; and ordered DMH to evaluate Defendant's mental ability and capacity within six months, and to submit to the trial court a progress report within 30 days of the evaluation. The cause was placed on the Mental Inactive Docket.

On August 30, 2006, the trial court took up the Review of Competency to Stand Trial filed by DMH and Fulton State Hospital. After considering a Pre–Trial Mental Evaluation report prepared by Erica Kempker, Psy. D. (Dr. Kempker) and Jeffrey S. Kline, Ph.D., dated August 2, 2006, the trial court found Defendant remained incompetent to proceed to trial and ordered Defendant's continued commitment to DMH with reevaluation within six months.

In February of 2007, the Director of DMH filed a Motion to Proceed, indicating that the staff of Fulton State Hospital where Defendant was being treated had determined that Defendant's unfitness to proceed no longer endured and that Defendant had the capacity to understand the proceedings against him and to assist in his own defense. Defendant filed an objection to the motion to proceed on February 21, 2007, requesting the court to order a second private examination. On March 15, 2007, the trial court continued the cause to allow Defendant to undergo a private evaluation.

On or about June 19, 2007, the State and Defendant jointly filed an agreement as to DMH's Motion to Proceed, indicating that Defendant had no additional witnesses to present regarding his competence, that both parties agreed Dr. Kempker's report contained sufficient information for the court to make its ruling, and that both parties agreed to submit the report without the necessity of a hearing.

In an order dated June 26, 2007, the trial court found that Defendant was no longer incompetent due to active schizophrenia and was no longer incompetent due to mild mental retardation, and that Defendant had the capacity to understand the proceedings against him and the nature of the judicial process. The court determined Defendant was able to assist in his defense and granted the Motion to Proceed. In making its determination, the trial court relied particularly on Dr. Kempker's report, noting that she had evaluated Defendant on February 8, 2006; July 31, 2006; and January 24, 2007.

The trial court noted that Dr. Kempker's last evaluation made no mention of mild mental retardation, but rather contained diagnoses of Antisocial Personality Disorder and Borderline Intellectual Functioning. The trial court indicated that this most recent evaluation concluded that Defendant had the capacity to understand the proceedings against him and the nature of the judicial process, and that Defendant was in full remission. Additionally, the trial court noted "that a strong suspicion of malingering appears in the diagnosis section. There are apparent inconsistencies in the defendant's psychotic symptoms, level of functioning and vocabulary skills. It appears the defendant displays lower functioning skills during evaluations than he does in regular daily interaction with others."

On February 29, 2008, upon Defendant's request, the trial court ordered Fulton State Hospital to permit Dr. Richard Scott contact visits with Defendant for the purposes of a private pretrial psychological evaluation. On June 3, 2008, upon Defen-

dant's request, the trial court ordered the hospital to permit Dr. Robert Gordon contact visits with Defendant for a private pretrial psychological evaluation.

Defendant waived jury trial, and the cause proceeded to a bench trial on or about January 26, 2009. Prior to the commencement of the proceedings on January 26, the trial court examined Dr. Kempker on the record. In response to the trial court's inquiry as to whether she had an opportunity to observe Defendant or had Defendant under the observance of her staff since the completion of her January 24, 2007 report, Dr. Kempker stated that the treatment team at Fulton State Hospital had continued to observe Defendant and document his behaviors since that time. Dr. Kempker stated that she had reviewed this documentation and nothing contained in it would lead her to believe that Defendant was mentally incompetent to assist in his trial. Dr. Kempker testified that there had been no changes in Defendant's condition since January 24, 2007, and stated that she had seen Defendant casually in the Fulton State Hospital since January 24, 2007, and had continued to engage in consultations with Defendant's treatment team, the members of whom agreed Defendant was competent.

Following additional questioning of Dr. Kempker by the State and by Defendant, Defendant and the State both indicated they knew of no reason that Defendant was not competent to stand trial. Defendant's only asserted affirmative defense was defense of others, and Defendant specifically indicated that he was not raising the defenses of diminished capacity, incompetency to assist at trial, or not guilty by reason of insanity.

As pertinent to the issues on appeal, the following evidence was adduced at trial. Police Officer Theophilus Buford (Buford) testified on behalf of the State. On April 25, 2005, Buford was employed as a police officer with the St. Louis Metropolitan Police Department and received a call concerning a possible homicide. Buford responded to the call and proceeded to 4730 Lewis Place. When he arrived at that location, he approached Defendant, who was talking on a telephone.

Buford asked Defendant to finish his call; when Defendant hung up, he told Buford that he wanted to talk with someone because he had just killed his grandmother's boyfriend. Buford then read Defendant his rights, took him into custody, and placed Defendant in the back seat of his patrol car.

After Defendant indicated that he understood his rights, he continued to speak to Buford. Defendant told Buford that after Defendant had come home to the apartment where he lived with his grandmother and had found his grandmother "on the floor choked out," he had gone after her boyfriend with a knife. Defendant told Buford that after he had initially stabbed the boyfriend, Defendant returned and stabbed him a couple more times in the stomach because he was upset. Defendant then changed clothes, threw the clothes he had been wearing away, and left the apartment. Defendant told Buford that he believed that his grandmother was dead and that she was cut. Defendant also told Buford that the boyfriend was dead.

George Weindel (Weindel) testified that on April 24, 2005, he was a police officer assigned to the Evidence Technician Unit, Laboratory Division of the St. Louis Metropolitan Police Department. On that date, he was called to the scene of a double homicide in an apartment on the eighth floor of the building at 711 North Euclid. In the course of processing the apartment, Weindel photographed the scene and the victims, and seized numerous objects. The

male victim, Rodney Staples (Staples) was found lying on the floor of the apartment's kitchen area. The female victim, Mary Morant (Morant) was found lying in a hallway of the apartment, between the kitchen and the bedroom.

Among the items seized from the apartment by Weindel was a blood-stained carving knife with an 8–inch blade. Weindel also retrieved an 11–inch serrated electric knife blade; a bloody, bent kitchen knife with a five-and-a-half-inch blade and a broken tip; a bent and bloody spatula; a bloody butcher knife with a 9–inch blade; and a pair of bloody scissors.

When Weindel photographed Morant, he took a closeup of the blood that was on the bottom of her socks and the bent knife lying at the bottom of her feet. Morant's feet were in the kitchen and her head was at the doorway leading to the bedroom. A telephone was lying next to Morant's right shoulder. Weindel photographed some injuries to Morant's hands and wrist area. Morant also had injuries on one of her legs. Morant's underwear was blood-stained.

Staples was discovered lying in a pool of blood and broken glass with a substantial injury to his left shoulder. Staples's penis had been cut off and was lying on his right shoulder. A small paring knife with a 3–inch blade and a broken tip was found next to Staples's body.

St. Louis Metropolitan Homicide Detective Thomas Carol (Carol) testified that on April 24, 2005, he was assigned to the scene of a double murder at 711 North Euclid. As part of his duties, Carol interviewed Defendant, as the suspect in the homicides. After Carol read Defendant his rights, Defendant initialed and signed a Warning and Waiver Form. After Defendant signed the form, Defendant made a statement, which was audiotaped in accordance with Defendant's choice to do so.

Kamal Sabharwal, M.D. (Dr. Sabharwal) testified that he was a medical examiner who covered cases in the City of St. Louis and several other jurisdictions. In the course of his duties, Dr. Sabharwal performed an autopsy on Staples. Dr. Sabharwal's external examination of Staples's body revealed the presence of two cuts and one abrasion on the head; two stab wounds and one abrasion to the neck; three stab wounds and seven cut wounds to the chest and upper thorax area; six stab wounds to the abdomen; four cut wounds and one abrasion to the back; one cut wound to the buttocks; four cut wounds to the right arm and hand; two cut wounds to the left arm; and four cut wounds to the left leg. In genital area of Staples's body, the penis had been cut off. Dr. Sabharwal testified that there were at least 13 injuries to Staples's neck and chest area; one of the wounds to his chest was extremely large, and Dr. Sabharwal could not tell if that wound resulted from one injury or several injuries. This large injury had exposed soft tissue, and a portion of Staples's lung protruded from it. Any of the injuries to Staples's upper left chest area could have caused Staples's death. Dr. Sabharwal testified that some of the injuries were inflicted after Staples died, including a wound to the lower thorax, the stab wounds to Staples's abdomen, and the severing of Staples's penis.

Dr. Sabharwal also performed an autopsy on Morant. During his external examination of Morant's body, Dr. Sabharwal noted redness on the skin of the neck, an abrasion on the neck, and cut wounds to the hands. Upon internal examination, Dr. Sabharwal discovered injuries to the strap muscles of Morant's neck and two fractures of the hyoid bone, which sits high up in the neck. These injuries are consistent with a manual strangulation. Dr. Sabharwal also found bleeding into the soft

tissue on both sides of Morant's chest. Dr. Sabharwal opined that the cause of Morant's death was strangulation.

Based on his training and experience as a forensic pathologist, Dr. Sabharwal believed that Staples died before Morant. Looking at the crime scene pictures and seeing that Morant's socks were blood-soaked led him to believe that she was standing in blood prior to her death. In contrast, when Dr. Sabharwal looked at Staples's feet, he found they were not soaked in blood.

After the State rested its case, the trial court recalled Dr. Kempker to discuss progress notes Dr. Kempker had reviewed and brought from Fulton State Hospital. After reviewing the hospital's last two years of progress notes concerning Defendant, Dr. Kempker was even more confident that Defendant was competent to stand trial. Documented incidents regarding disciplinary actions taken against Defendant while he was at the hospital revealed that when Defendant was dissatisfied with the consequences of his behavior, he would collect the opinions of people who may have witnessed the incident, present this information to a social worker or case manager, and argue that the consequences were either too severe or should be removed. Defendant was successful in getting some infractions reduced or removed. Dr. Kempker further testified that the notes also recorded instances where Defendant would represent to others that he was unable to read, but in group situations, Defendant would read from homework assignments or handouts without a problem.

Dr. Kempker diagnosed Defendant with schizophrenia, differentiated type, in full remission; anti-social personality disorder; borderline intellectual functioning; and malingering. Malingering is when an individual either exaggerates or feigns psycho-logical systems for secondary gain. Dr. Kempker opined that Defendant was competent to stand trial, that he understood the legal proceedings against him and that he could assist in his own defense.

At the close of the State's case, the trial court denied Defendant's oral Motion for Judgment of Acquittal. At the conclusion of the proceedings, Defendant again moved orally for Judgment of Acquittal; his motion was again denied and the cause was taken under submission. In a Judgment dated February 6, 2009, the trial court found Defendant guilty of two counts of murder in the first degree and one count of armed criminal action. The trial court sentenced Defendant to two terms of life imprisonment without parole on the murder counts and to a term of ten years' imprisonment on the armed criminal action count, all terms to be served concurrently. This appeal follows.

*Standard of Review*

Where available facts do not rise to the level of reasonable cause, a trial court's failure to sua sponte order a mental competency exam is reviewed under an abuse of discretion standard. *State v. Tilden,* 988 S.W.2d 568, 576 (Mo.App. W.D.1999). When sufficient information arises before the trial court to "raise a reasonable cause to believe" that a defendant may be incompetent to stand trial, there is a non-relenting duty to order an exam and failure to do so will be reviewed carefully due to the constitutional implications. *Id.*

Claims challenging the sufficiency of evidence are reviewed to determine whether sufficient evidence exists from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Wilson,* 256 S.W.3d 58, 62 (Mo. banc 2008).

## Discussion

### Point I

█ In his first point, Defendant claims the trial court plainly erred in failing sua sponte to order a competency evaluation because Defendant was unable to provide lucid, coherent answers to the trial court's questions and because Defendant's irrational and bizarre behavior before trial, during trial, and before sentencing raised reasonable cause to believe Defendant was incompetent, could not consult with his lawyer with a reasonable degree of rational understanding, and did not possess a rational as well as factual understanding of the proceedings against him. Defendant asserts that the trial court should have continued the trial for another competency examination.

A trial court's ruling concerning the competency of a defendant is a factual determination which must be upheld unless there is no substantial evidence to support it. *State v. Elam*, 89 S.W.3d 517, 521 (Mo.App. W.D.2002). We do not weigh the evidence, but accept as true all evidence and reasonable inferences that tend to support the trial court's findings. *Id.* The accused has the burden to prove incompetence. *Id.*

We find no error in the trial court's failure to order sua sponte another competency examination. In so deciding, we have considered several factors, including whether: 1) Defendant's counsel thoroughly investigated the issue of Defendant's competency; 2) a motion for a competency examination was made during trial; 3) Defendant's behavior at trial alerted the court to Defendant's incompetence; and 4) affirmative evidence of Defendant's competency was presented during trial. *State v. Johns*, 34 S.W.3d 93, 106 (Mo. banc 2000); *State v. Tokar*, 918 S.W.2d 753, 764–65 (Mo. banc 1996).

Although Defendant now points to incidents and conversations during trial that he alleges should have alerted the trial court to a change in his competency, we find these unpersuasive, particularly in light of Dr. Kempker's opinion that Defendant exaggerated or feigned psychological systems for secondary gain. Here, the question of Defendant's competency was thoroughly investigated. In fact, the record reveals that on February 29 and June 3, 2008, the trial court even ordered the Fulton State Hospital to permit two different medical providers contact visits with Defendant, in accordance with Defendant's requests for private pretrial psychological evaluations.

█ "When the trial court makes a valid pretrial finding of competency, the trial court need only conduct a second hearing on its own motion when new evidence of incompetence casts doubt upon the original finding." *Johns*, 34 S.W.3d at 106. There is no indication of such evidence in this case; in fact, in an abundance of caution, the trial court recalled Dr. Kempker when the State rested its case, specifically to address evidence of any change in Defendant's competency. Significantly, Dr. Kempker's testimony regarding the last two years' documentation of Defendant's mental status only confirmed her opinion that Defendant was competent.

Moreover, Defendant specifically indicated that he was not raising the defenses of diminished capacity, incompetency to assist at trial, or not guilty by reason of insanity. Defendant's waiver of the competency issue, particularly given his opportunity to have two private pretrial psychological evaluations in February and June of 2008, is "persuasive evidence that there was no 'bona fide doubt' as to defendant's competency during trial." *Johns*, 34 S.W.3d at 106. The trial court did not err,

plainly or otherwise, in failing to order sua sponte another competency evaluation.

Point denied.

## Point II

■ In his second point, Defendant claims the trial court erred in overruling Defendant's motion for judgment of acquittal at the close of all the evidence, in entering judgment of conviction, and in sentencing Defendant for murder in the first degree because the State's evidence was insufficient to support a finding of guilt beyond a reasonable doubt that Defendant caused the death of Rodney Staples after deliberation upon the matter.

We review the denial of a motion for acquittal to ascertain whether the state adduced sufficient evidence to make a submissible case. *State v. Clark*, 272 S.W.3d 432, 438 (Mo.App. S.D.2008). "Review of sufficiency of the evidence in a court-tried criminal case is determined by the same standard as in a jury-tried case." *State v. Lasley*, 130 S.W.3d 15, 16 (Mo.App. E.D. 2004).

We accept as true all evidence favorable to the state, viewing all reasonable inferences most favorable to the verdict and disregarding all evidence and inferences to the contrary. *Id.* Our consideration of the sufficiency of the evidence requires us to determine whether sufficient evidence exists to permit a reasonable trier of fact to find guilt beyond a reasonable doubt. *Id.*

■ "Deliberation requires only a brief moment of 'cool reflection' and may be inferred from the fact that a defendant had the opportunity to terminate an attack after it began." *State v. Cole*, 71 S.W.3d 163, 169 (Mo. banc 2002). While not conclusive, evidence of numerous wounds or repeated blows may support an inference of deliberation. *Id.*

Here, Defendant stabbed or cut Staples in excess of thirty-times. According to the medical examiner, one of the injuries to Staples's chest was so large that soft tissue and a portion of Staples' lung protruded from it. At least thirteen of these injuries were inflicted to Staples's neck and chest area, and any of these wounds could have caused his death. The evidence further revealed that several of the injuries were inflicted after Staples died, including the severing of his penis. Defendant himself told Buford that he had returned and stabbed Staples "a couple more times in the stomach" after the initial attack.

Defendant's choice to continue his assault on Staples even after Staples was dead provides sufficient evidence from which a reasonable trier of fact could find the element of deliberation beyond a reasonable doubt. *Id.* The trial court did not err in overruling Defendant's motions for judgment of acquittal, in entering judgment of conviction, and in sentencing Defendant for murder in the first degree.

Point denied.

## Conclusion

The judgment of the trial court is affirmed.

KURT S. ODENWALD, P.J., and GEORGE W. DRAPER, III, J., concur.